NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2015-OHIO-4903

THE STATE OF OHIO, APPELLEE, *v.* JOHNSON, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Johnson,* Slip Opinion No. 2015-Ohio-4903.]**

*Criminal law—Aggravated murder—Death penalty—Appeal from retrial on mitigation only—Pursuant to independent evaluation of sentence under R.C. 2929.05(A), death sentence vacated and cause remanded for resentencing consistent with R.C. 2929.06—Aggravating circumstances do not outweigh mitigating factors beyond reasonable doubt—Death penalty inappropriate.*

(No. 2012-0405—Submitted June 10, 2015—Decided December 1, 2015.)

APPEAL from the Court of Common Pleas of Hamilton County, No. B9708745.

_____

**PFEIFER, J.**

**{¶ 1}** In 1998, defendant-appellant, Rayshawn Johnson, was convicted of the 1997 aggravated murder of Shanon Marks and was sentenced to death. Finding

no success on direct appeal or through the postconviction process in state court, Johnson sought habeas corpus relief in federal court and was granted relief there on the grounds that he had received ineffective assistance of trial counsel during the mitigation phase of his trial.

{¶ 2} In 2011, the state conducted a new mitigation hearing. A new judge presided over the hearing, and 12 new jurors recommended a sentence of death. The trial court again imposed a death sentence, and we now review Johnson's direct appeal as of right from that sentence. We find that there were no significant procedural defects in the new mitigation hearing, but, pursuant to our independent evaluation of the sentence under R.C. 2929.05(A), we determine that the aggravating circumstances in this case do not outweigh beyond a reasonable doubt the mitigating factors. We accordingly vacate the sentence of death and remand the cause to the trial court for resentencing consistent with R.C. 2929.06.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Johnson's 1998 Trial, Conviction, and Sentence

{¶ 3} In 1998, a jury convicted Johnson of aggravated felony murder, R.C. 2903.01(B), with two accompanying death specifications: Johnson committed murder during the course of an aggravated burglary and aggravated robbery, and he acted with prior calculation and design or was the principal offender in the crime, R.C. 2929.04(A)(7). *State v. Johnson*, 88 Ohio St.3d 95, 101, 723 N.E.2d 1054 (2000). Johnson was sentenced to death. *Id.*

{¶ 4} Johnson challenged his conviction and sentence on the grounds that he had received ineffective assistance of counsel during the mitigation phase of his trial. The Ohio courts rejected this argument. *See id.* at 120, 130 (direct appeal); *State v. Johnson*, 1st Dist. Hamilton No. C-000090, 2000 WL 1760225, at *3-9 (Dec. 1, 2000) (appeal from denial of petition for postconviction relief), *appeal not accepted,* 91 Ohio St.3d 1481, 744 N.E.2d 1194 (2001). In April 2002, Johnson filed a habeas corpus petition in the United States District Court for the Southern

District of Ohio. *Johnson v. Bagley*, S.D.Ohio No. 1:02-cv-220, 2006 WL 5388021, *6 (Apr. 24, 2006). After conducting an evidentiary hearing, *id.* at *47, the district court granted habeas relief on Johnson's claim of ineffective assistance of counsel at mitigation. *Id.* at *72-73. On April 24, 2006, the court directed the state to commute Johnson's death sentence or grant him a new mitigation hearing. *Id.* The Sixth Circuit Court of Appeals affirmed. *Johnson v. Bagley*, 544 F.3d 592, 594 (6th Cir.2008).

### B. Johnson's 2011 Mitigation Hearing and 2012 Sentence

{¶ 5} Johnson's second mitigation hearing began on November 30, 2011. The common pleas court assigned a new presiding judge, who in turn seated a new panel of jurors. The judge instructed the jurors that they must adhere to the prior guilty verdict as to aggravated murder and the two related death-penalty specifications and that they could consider only those two specifications as aggravating circumstances for sentencing purposes.

### *1. The State's Evidence*

{¶ 6} Because the new jurors had not heard the guilt phase of Johnson's trial, the state presented seven witnesses during the new mitigation hearing. The prosecutor also reintroduced all but one of the state's exhibits from Johnson's original trial, including numerous photos of Shanon's body at the crime scene and during the autopsy. The state's evidence established the following. *See also State v. Johnson*, 88 Ohio St.3d at 96-101, 723 N.E.2d 1054.

{¶ 7} According to Johnson's recorded confessions, he decided to enter the Marks residence on the morning of November 12, 1997, because he needed money. Before leaving home, Johnson picked up a baseball bat and a pair of gloves. Then Johnson climbed out a window in his garage and over a fence into the Markses' backyard, which was contiguous to his own.

{¶ 8} Johnson was familiar with the layout of the Marks residence because he had done work there for a previous owner. He entered their unlocked back door

and walked up the back staircase. Johnson spotted Shanon in the upstairs bathroom, looking out the window. He hit the back of her head and shoulder area with the bat. He hit her again after she fell to the floor.

{¶ 9} Johnson then found Shanon's purse in the master bedroom and emptied its contents on the bed. Shanon's husband, Norman Marks, testified that she should have had close to $50 in her purse that day, but police found no money.

{¶ 10} After Johnson left the house, he discarded the gloves in a trash bin, broke the bat with a brick, and threw the pieces of the bat into Eden Park. Police did not recover the gloves or the bat. However, they did find shoe prints consistent with Johnson's Air Jordan sneakers both in the Markses' bathroom and on a railroad tie along the fence line between Johnson's and the Markses' homes.

{¶ 11} Norman arrived home from work around 8:00 p.m., discovered his wife's body, and called 9-1-1.

{¶ 12} Emergency responders concluded that Shanon had been dead for hours. The coroner's autopsy indicated that she had suffered massive head injuries, consistent with being hit multiple times—with much force—with a baseball bat. Shanon died of lacerations to the brain, caused by a blunt object hitting her head. Her left forearm was broken and her hands were bruised, indicating that she had tried to protect herself.

{¶ 13} In the hours following Shanon's death, Johnson watched police investigate the murder from a window in his house. Over the next few days, he spoke to the media on several occasions. He told reporters that his dog had been barking around 7:30 a.m. on November 12. He also expressed concern about having crime in the neighborhood.

{¶ 14} Police interviewed Johnson at his home on November 14, then at the police station on November 15. Johnson confessed in two recorded statements and was arrested. On November 16, he provided a third recorded statement at the county jail, in which he claimed that a man named Dante had accompanied him into

4

the Markses' home and that Dante had delivered the final blows to Shanon with the handle of a gun.

### 2. Johnson's Evidence

{¶ 15} During the 2011 mitigation hearing, the defense presented five witnesses, Johnson's unsworn statement, and eight exhibits. A detailed description of the testimony is included in our independent sentence evaluation below.

### 3. 2012 Death Sentence

{¶ 16} On December 7, 2011, the jury recommended a sentence of death.

{¶ 17} The judge did not immediately sentence Johnson, because he wanted time to review the trial transcript and exhibits from Johnson's original trial for any possible mitigation evidence the defense might have missed. The court also admitted the original 11-volume trial transcript into evidence as a court exhibit. On January 10, 2012, the trial court concluded that the aggravating circumstances outweighed the mitigating factors and sentenced Johnson to death.

{¶ 18} Johnson now appeals, raising seven propositions of law.

## II. LAW AND ANALYSIS

### A. Jury Issues

{¶ 19} In proposition of law No. I, Johnson, an African-American, argues that the state violated his equal-protection rights by purposefully excluding two African-American prospective jurors. In addition, proposition of law No. 2 asserts that Johnson's trial counsel were ineffective for failing to effectively present *Batson* challenges during voir dire.

### 1. Batson v. Kentucky

{¶ 20} Criminal defendants have a constitutional right to be tried by a jury selected by nondiscriminatory criteria. *Batson v. Kentucky*, 476 U.S. 79, 85-86, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Accordingly, a prosecutor may not "challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against

a black defendant." *Id.* at 89. " '[T]he striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors.' " *United States v. Harris*, 192 F.3d 580, 587 (6th Cir.1999), quoting *United States v. Battle*, 836 F.2d 1084, 1086 (8th Cir.1987).

{¶ 21} In *Batson*, the United States Supreme Court established a three-step inquiry for trial courts to adjudicate claims of race-based challenges to jurors. *Batson* at 96. First, a defendant must make a prima facie case that the prosecutor is engaged in racial discrimination. *Id.* at 96-97. Second, if the defendant satisfies that burden, the prosecutor must provide a racially neutral explanation for the challenge. *Id.* at 97-98. Finally, the court must decide, based on all the circumstances, whether the defendant has proved purposeful racial discrimination. *Id.* at 98. In doing so, the court must consider the circumstances of the challenge and assess the plausibility of the prosecutor's explanation in order to determine whether it is merely pretextual. *See Miller-El v. Cockrell*, 537 U.S. 322, 339, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 65.

{¶ 22} Johnson argues that a trial court must undertake its own investigation of a prosecutor's race-neutral explanation, even if the defense has not challenged that explanation in any way. But neither this court nor the United States Supreme Court has imposed "a duty on the trial court to conduct an independent inquiry into the relevant facts and circumstances bearing on the credibility of the prosecution's stated reasons." *United States v. Houston*, 456 F.3d 1328, 1338-1339 (11th Cir.2006); *see also Johnson v. Gibson*, 169 F.3d 1239, 1248 (10th Cir.1999); *United States v. Baskerville*, D.N.J. No. 03-836, 2011 WL 159782, at *5 (Jan. 18, 2011). *But see United States v. Torres-Ramos*, 536 F.3d 542, 560 (6th Cir.2008) (at step three of *Batson*, the trial judge has "an affirmative duty * * * to examine relevant evidence that is easily available").

**{¶ 23}** We defer to a trial court's resolution of a *Batson* challenge absent a showing of clear error. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 53.

### 2. Prospective Juror No. 9

**{¶ 24}** Johnson challenges the exclusion of prospective juror No. 9, an African-American woman.

**{¶ 25}** Prospective juror No. 9 indicated some ambivalence toward the death penalty. On her pretrial jury questionnaire, she stated: "Putting someone to death is difficult for me, however sometimes it may be necessary. *I do not want to make that decision*." (Emphasis added.) Prospective juror No. 9 also indicated that she believed that the death penalty was an inappropriate penalty for most murder cases. During voir dire, she stated that she has "mixed feelings on the death penalty" and opined that it might be appropriate under some circumstances.

**{¶ 26}** Ultimately, prospective juror No. 9 confirmed that she would follow the judge's instructions and would be able to sign a death-penalty verdict. Contrary to Johnson's suggestions, these assurances did not refute prospective juror No. 9's stated reluctance to have to make a decision about whether to impose the death penalty. Prospective juror No. 9 indicated only that she would follow the law, not that she was any less reluctant to decide between life and death.

**{¶ 27}** Prospective juror No. 9's responses also suggested that she would likely be sympathetic to the defense with regard to issues of addiction. She commented that addiction affects one's personality, can make one "abusive, disrespectful, and dangerous," and "[c]an eventually lead to mental health issues." And she explained that her husband had struggled to overcome a crack addiction. In addition, prospective juror No. 9 said she had witnessed how addiction can lead parents to mentally abuse their children. Notably, she specifically identified the absence of parents—"No father—No mother. Grandparents raising children"—as a major cause of crime.

**{¶ 28}** The state used its third peremptory challenge to excuse prospective juror No. 9. When the defense objected on *Batson* grounds, the prosecutor offered two explanations. First, he stated that the main reason for excusing prospective juror No. 9 was her attitude toward the death penalty. The prosecutor cited the jury questionnaire, which indicated that prospective juror No. 9 did not *want* to decide whether to sentence someone to death, as well as her belief that the death penalty is inappropriate in most murder cases. Second, the prosecutor opined that prospective juror No. 9 was likely to "attribute what [Johnson] did to the fact that he wasn't raised by his parents" because she believes that factor is a major cause of crime.

**{¶ 29}** The trial court asked whether the defense wanted to present further argument in response to the prosecutor's explanations, but defense counsel declined. Then, the judge accepted the prosecutor's reasons as race-neutral and rejected the *Batson* challenge.

**{¶ 30}** Johnson now argues that the prosecutor's concerns about prospective juror No. 9's views toward the death penalty were pretextual because they also applied to juror No. 1, a Caucasian juror who was not excused; the prosecution did not use all of its peremptory challenges and therefore could have excused juror No. 1 as well. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an *otherwise-similar* nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (Emphasis added.) *Miller-El v. Dretke*, 545 U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). If such disparate treatment goes unexplained, it can establish that a prosecutor's reason is pretextual. *See United States v. Odeneal*, 517 F.3d 406, 420 (6th Cir.2008).

**{¶ 31}** Like prospective juror No. 9, juror No. 1 did indicate some hesitation about the death penalty on her jury questionnaire. Both women checked a box indicating that the death penalty is "[a]ppropriate in some murder cases, but

inappropriate in most murder cases." Juror No. 1 also wrote, "I believe in the death penalty once there isn't a shadow of a doubt that the defendant is g[u]ilty. I feel there has to be overwhelming actual proof." But this comment was not particularly relevant in this case, because Johnson's guilt had already been adjudicated by a jury in 1998.

**{¶ 32}** Prospective juror No. 9 and juror No. 1 were not otherwise similar. *Miller-El* at 241. In fact, they differed in significant ways. *Compare id.* at 247 (observing that the differences between two jurors in that case "seem[ed] far from significant"). Unlike prospective juror No. 9, juror No. 1 never indicated that she *did not want to* have to decide whether to impose the death penalty. In addition, juror No. 1's voir dire responses suggested that she might be more favorably disposed to the prosecution than prospective juror No. 9. When discussing her sister-in-law's drug addiction, juror No. 1 commented that her sister-in-law needed to help herself. She also implied that her husband had been able to overcome addiction by turning to religion. These statements indicate that juror No. 1 might be unsympathetic to Johnson's mitigation evidence about addiction. Accordingly, the prosecution could reasonably have been more willing to keep juror No. 1 on the jury than prospective juror No. 9.

**{¶ 33}** The prosecutor cited both explanations for excusing prospective juror No. 9. And we are unconvinced that the trial court erred by accepting the prosecutor's race-neutral explanations as credible. Indeed, Johnson's allegation of unlawful pretext is further undermined by the presence of an African-American juror and an African-American alternate on his panel even though the state had peremptory challenges available to excuse both of them. *See State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 92 (while presence of African-Americans on jury does not rule out discrimination, the fact may be considered evidence of lack of intent to discriminate).

**{¶ 34}** Johnson pressed the opposite conclusion, both in his briefs and at oral argument. He urges us to consider *only* prospective juror No. 9's views on the death penalty, and not the other ways in which she differed from juror No. 1. Johnson emphasizes that defendants need not "show that the excluded venire panelist was similarly situated to a white potential juror in *all* respects" in order to prevail on a *Batson* claim. (Emphasis added.) *Torres-Ramos*, 536 F.3d at 559. In support, he cites the United States Supreme Court's decision in *Miller-El v. Dretke*, which found a *Batson* violation even though one of the prosecutor's proffered reasons for excluding an African-American juror did not apply to white prospective jurors. 545 U.S. at 246-247, 125 S.Ct. 2317, 162 L.Ed.2d 196.

**{¶ 35}** In *Miller-El*, the prosecutor offered two explanations for peremptorily striking an African-American juror. First, he cited the juror's views on the death penalty. *Id.* at 244. Then, *after* defense counsel pointed out that the prosecutor had mischaracterized the juror's views, the prosecutor offered a second reason: the juror's brother had a prior criminal conviction. *Id.* at 246. The United States Supreme Court found that the prosecutor's reference to the criminal conviction was pretextual; it "reek[ed] of afterthought" *and* was "implausible" for numerous other reasons. *Id.* ("There is no good reason to doubt that the State's afterthought * * * was anything but makeweight"). As a result, the court concluded that the prosecutor's second reason was irrelevant when comparing the excluded juror to other jurors and held that a *Batson* violation had occurred. *Id.*

**{¶ 36}** This case is unlike *Miller-El* because the circumstances here do not indicate that the prosecutor's second reason was merely pretextual. The prosecutor offered both explanations at the same time. And unlike the brother's criminal history in *Miller-El*, prospective juror No. 9's attitudes about the causes of crime were central to the core issue before the jury: whether the aggravating circumstances outweighed the mitigating evidence Johnson presented (largely about his background and addiction) beyond a reasonable doubt. As a result, we

10

do not disregard the prosecutor's second explanation for striking prospective juror No. 9.

{¶ 37} The trial court properly rejected Johnson's *Batson* challenge to the exclusion of prospective juror No. 9.

### 3. *Prospective Juror No. 45*

{¶ 38} Johnson also challenges the exclusion of prospective juror No. 45, an African-American woman, as an alternate.

{¶ 39} On her jury questionnaire, prospective juror No. 45 indicated that she was unsure of her views about the death penalty. She believed that it was "[a]ppropriate in some murder cases, but inappropriate in most murder cases." During voir dire, prospective juror No. 45 stated that she could be fair and that she would be able to sign either a verdict of death or a verdict for one of the life-sentence options. Defense counsel pressed this issue, and prospective juror No. 45 confirmed that she could reserve judgment until after she heard all the evidence and then follow the law.

{¶ 40} Separately, prospective juror No. 45 stated that her son had been convicted of a crime. However, she said that her son's experiences had not affected her views of the criminal justice system.

{¶ 41} The prosecutor used a peremptory challenge to excuse prospective juror No. 45 as an alternate. Defense counsel raised a *Batson* challenge, and the prosecutor offered several explanations. First, he opined that prospective juror No. 45 was "very weak on the death penalty"; she "felt it was inappropriate in most cases." Second, he noted that prospective juror No. 45's questionnaire was largely incomplete. Third, prospective juror No. 45's son had been convicted of a crime.

{¶ 42} The trial court inquired whether the defense had any further arguments, but defense counsel offered no response to the prosecutor's explanation. The trial court then concluded that the explanation was race-neutral and rejected the *Batson* challenge.

{¶ 43} Johnson asserts that the trial court erred because the prosecutor's explanation about prospective juror No. 45's views on the death penalty was pretextual. He says that juror No. 1's views of the death penalty were as "weak" as prospective juror No. 45's on her questionnaire. Yet the prosecutor did not ask juror No. 1 any follow-up questions on this issue during voir dire or seek to exclude her from the jury.

{¶ 44} Johnson cannot prevail on this claim, because he failed to challenge the prosecutor's explanations at trial and cannot now establish error, let alone clear error. Indeed, even now he does not attempt to challenge two of the prosecutor's three explanations for excusing prospective juror No. 45. And he does not point to additional evidence suggesting that these reasons were not credible. Moreover, the fact that the prosecution did not excuse another African-American juror or an African-American alternate, even though it had not used all of its peremptory challenges, suggests that the prosecutor's reasons were not merely pretextual. *See Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, at ¶ 92.

{¶ 45} The trial court did not err by allowing the prosecutor to excuse prospective juror No. 45.

### 4. Ineffective Assistance of Counsel

{¶ 46} Johnson also asserts that his trial counsel provided ineffective assistance by failing to effectively contest the state's use of peremptory challenges to excuse prospective juror Nos. 9 and 45. Specifically, he argues that counsel should have presented additional evidence to persuade the trial court that the prosecutor's race-neutral explanations for excusing prospective juror Nos. 9 and 45 were pretextual.

{¶ 47} We reject Johnson's claim of ineffective assistance because there is no evidence that counsel's performance "fell below an objective standard of reasonableness," as determined by "prevailing professional norms," in this regard.

*Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Johnson's *Batson* claim is unsupported by the record before us.

{¶ 48} For these reasons, we reject Johnson's first two propositions of law.

## B. Evidentiary Issues

{¶ 49} In proposition of law No. 3, Johnson asserts that his constitutional rights were violated because the state introduced irrelevant and prejudicial evidence during his 2011 mitigation hearing.

### 1. Admissibility of Evidence at the Mitigation Phase of a Capital Trial

{¶ 50} At the mitigation phase of a capital trial, the fact-finder is charged with a specific task: deciding whether the aggravating circumstances—the death specifications of which the defendant was convicted at the trial phase—outweigh mitigating factors beyond a reasonable doubt. R.C. 2929.03(D)(2). As part of this weighing process, "the sentencer *must* consider the nature and circumstances of the offense, whether they have mitigating impact or not and whether the defense raises them or not." (Emphasis sic.) *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 127.

{¶ 51} Given the nature of this balancing, "at the penalty stage of a capital proceeding, [a prosecutor] may introduce ' * * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing.' " *State v. DePew*, 38 Ohio St.3d 275, 528 N.E.2d 542 (1988), paragraph one of the syllabus, quoting R.C. 2929.03(D)(1). In addition, because the sentencer "must consider the nature and circumstances of the offense, R.C. 2929.03(D)(1) 'permit[s] repetition of much or all that occurred during the guilt stage.' " *State v. Fears*, 86 Ohio St.3d 329, 345-346, 715 N.E.2d 136 (1999), quoting *DePew* at 282-283.

{¶ 52} To be admissible, evidence must be relevant. Evid.R. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than

it would be without" it. Evid.R. 401. But even relevant evidence must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Evid.R. 403(A). In a capital case, however, a higher standard applies to the admissibility of gruesome photographs. Gruesome photos are admissible only if (1) their "probative value * * * outweigh[s] the danger of unfair prejudice" to the defendant and (2) they are "neither repetitive nor cumulative in nature." *State v. Morales*, 32 Ohio St.3d 252, 258, 513 N.E.2d 267 (1987).

{¶ 53} We will not disturb a trial court's evidentiary rulings unless we find "an abuse of discretion that has created material prejudice." *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, at ¶ 43.

### 2. *The State's Mitigation-Phase Evidence Against Johnson*

{¶ 54} At Johnson's 2011 mitigation hearing, the trial court permitted the prosecutor to readmit virtually all of the exhibits from Johnson's original trial, over defense objection. The prosecutor did not reintroduce any evidence about Johnson's crimes against a second victim, Nicole Sroufe.

{¶ 55} Johnson now argues that three types of evidence should have been excluded as irrelevant and prejudicial: victim photos, Norman Marks's 9-1-1 call, and Johnson's 1997 media interviews.

### a. Victim photos

{¶ 56} Johnson argues that the trial court erred by admitting gruesome crime-scene and autopsy photos of Shanon Marks, over his objection, during the 2011 mitigation hearing. According to Johnson, the photos were irrelevant, unduly prejudicial, and repetitive and cumulative.

{¶ 57} During both phases of Johnson's 1998 trial, the court admitted crime-scene photos "depict[ing] where Shanon was found and [showing] that portions of her head and other parts of her body had been severely beaten." *Johnson*, 88 Ohio St.3d at 117, 723 N.E.2d 1054. The court also admitted autopsy

photos "depict[ing] Shanon's head and bodily injuries, with color photographs showing her head with the scalp pulled down to illustrate the damage that occurred to her skull." *Id.* The trial court admitted the same photos, over Johnson's objection, during the 2011 mitigation hearing.

**{¶ 58}** On his first direct appeal to this court, Johnson argued that the trial court erred by admitting these photos during the 1998 mitigation phase. In that case, this court held that the photos were properly admitted at the trial phase because they were relevant, their probative value outweighed the danger of material prejudice to Johnson, and they were not repetitive or cumulative. *Id*. at 117-118, citing *State v. Maurer*, 15 Ohio St.3d 239, 473 N.E.2d 768 (1984), paragraph seven of the syllabus, and *Morales*, 32 Ohio St.3d at 258, 513 N.E.2d 267. In light of that conclusion, this court summarily rejected Johnson's claim that the trial court erred by readmitting the photos during the mitigation phase. *Johnson* at 118, citing *DePew*, 38 Ohio St.3d at 282-283, 528 N.E.2d 542.

**{¶ 59}** Our 2000 decision rejecting Johnson's claim remains the law of this case. *See State v. Davis*, 139 Ohio St.3d 122, 2014-Ohio-1615, 9 N.E.3d 1031, ¶ 27. Accordingly, Johnson cannot prevail on his present claim to the extent that the claim was or could have been pursued in his first appeal. *Id.*

**{¶ 60}** Johnson does make one argument about the photos that could not have been raised previously because it is specific to the prosecutor's conduct during the 2011 mitigation hearing. Namely, he argues that the trial court erred by allowing the state to show "many of the same images * * * multiple times during the sentencing phase." The state displayed ten photos of Shanon during opening statements. The jury saw some of the images again during Officer Robert Randolph's testimony and others again during the coroner's testimony. But the trial court did not abuse its discretion by allowing the prosecutor to publish certain images twice, where the prosecution was reasonably employing the images to illustrate its argument and facilitate witness testimony. *See State v. Strong*, 142

S.W.3d 702, 720-721 (Mo.2004) (en banc) (rejecting defendant's claim that trial court erred by allowing prosecutor to present a slideshow including gruesome images, most of which had already been admitted at trial phase, during penalty-phase closing arguments).

{¶ 61} Thus, the trial court did not err by admitting the challenged photos or permitting the prosecutor to publish them to the jury more than once.

### b. Norman's 9-1-1 call

{¶ 62} Johnson also asserts that the trial court abused its discretion by admitting a recording of the 9-1-1 call Norman Marks made after discovering his wife's body.

{¶ 63} Over defense objection, the prosecutor played the 9-1-1 call during Officer Randolph's testimony. On the recording, Norman related information about the state of Shanon's body when he found her shortly before 8:15 p.m. He stated that Shanon was unconscious and covered with blood, lying face down in the bathroom. Norman had great difficulty turning Shanon over to attempt CPR. Norman also told the operator that he could not tell what had happened and did not see a weapon.

{¶ 64} According to Johnson, the 9-1-1 call was irrelevant to his 2011 mitigation hearing. But, as explained above, the fact-finder at a capital mitigation hearing is obliged to consider the nature and circumstances of an offense to arrive at a sentence. *DePew*, 38 Ohio St.3d at 282-283, 528 N.E.2d 542 (R.C. 2929.03(D)(1) permits repetition of much or all that occurred during the guilt stage). Norman's statements on the 9-1-1 call convey the circumstances in which Johnson left his victim.

{¶ 65} Johnson also argues that the 9-1-1 call should have been excluded because the state introduced it only to inflame the jury; all the information on the recording was cumulative to Norman's testimony at the 2011 hearing. This

amounts to an argument that the trial court should have excluded the evidence under Evid.R. 403(A) because it had minimal probative value.

{¶ 66} As Johnson notes, the evidence had the potential to prejudice the jury because Norman sounded highly emotional and frantic on the recording. This no doubt "arouse[d] the jury's emotional sympathies" with Norman and quite possibly "evoke[d] a sense of horror, or appeal[ed] to an instinct to punish" Johnson. *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001).

{¶ 67} But the recording does contain additional details about the crime scene as Norman found it, such as the position in which he discovered Shanon's body. And the recording also served to corroborate Norman's testimony, which was important, given that he was testifying 14 years after the murder. Under the circumstances, the trial court did not abuse its discretion by concluding that the evidence was more probative than prejudicial.

{¶ 68} The trial court did not err by admitting the 9-1-1 recording into evidence.

### c. Johnson's 1997 media interviews

{¶ 69} Finally, Johnson claims that the trial court erred by admitting evidence of media interviews that he gave shortly after Shanon's murder.

{¶ 70} On November 13 and 14, 1997, Johnson spoke to three local television reporters. He stated that around 7:30 a.m. on November 12, 1997, he heard his dog barking and went to get her. Johnson said that he did not see anyone outside. He told them that later that night, he saw cameras flashing in the Markses' bathroom and a coroner's vehicle outside their house. Johnson told the reporters that he was shocked that this crime had occurred in the neighborhood and indicated concern about staying there with his family.

{¶ 71} Over defense objection, the prosecutor introduced a video recording depicting the three media interviews both at Johnson's 1998 trial and his 2011 mitigation hearing.

**{¶ 72}** A defendant's statements to reporters, like other conduct following the completion of a crime, may be relevant evidence of consciousness of guilt. *See People v. Cain*, 10 Cal.4th 1, 32, 40 Cal.Rptr.2d 481, 892 P.2d 1224 (1995). And "[e]vidence of consciousness of guilt * * * [is evidence] of guilt itself." *State v. Williams,* 79 Ohio St.3d 1, 11, 679 N.E.2d 646 (1997); *State v. Moore*, 7th Dist. Mahoning No. 12 MA 8, 2013-Ohio-1435, 990 N.E.2d 625, ¶ 132. But Johnson asserts that the interviews were relevant *only* to his guilt, and not to his sentence.

**{¶ 73}** The state argues that media interviews are admissible during the mitigation phase because, under *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, they provide evidence of the nature and circumstances of an offense. *Davis* held that "a prosecutor may legitimately refer to the nature and circumstances of the offense" for certain purposes, *id.* at ¶ 326, but it did not specifically address whether a defendant's media interviews after the completion of a crime fall under the rubric of "nature and circumstances."

**{¶ 74}** Here, Johnson's statements to the press revealed very little about the nature and circumstances of the crime. However, the statements did indicate that the crime likely occurred around 7:30 a.m., and they established that Johnson could see into the Markses' bathroom from a window in his own home. Thus, at least to some minimal degree, the media interviews were relevant evidence of nature and circumstances.

**{¶ 75}** Johnson also argues that the interviews should have been excluded as unfairly prejudicial. He reasons that the interviews had little, if any, probative value. By contrast, he asserts that there was a high likelihood of unfair prejudice because the interviews, which were played twice for the jury, were very likely to appeal to the jurors' emotions and their instincts to punish him. On the video, Johnson (who later confessed) said that he had been shocked to learn of this crime in his neighborhood, and he said that he had heard dogs barking on the morning of the murder and wished he had seen the perpetrator. These brazen

18

misrepresentations could impassion a jury. However, even if the trial court arguably should have excluded the evidence, at most Johnson can establish "a mere error of law or judgment," which is insufficient to prevail on abuse-of-discretion review. *Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, at ¶ 91. Moreover, the alleged error was harmless in light of the remaining evidence adduced during the mitigation phase. *See, e.g.*, *DePew*, 38 Ohio St.3d at 287, 528 N.E.2d 542.

{¶ 76} For all these reasons, we reject proposition of law No. 3.

### C. Prosecutorial Misconduct

{¶ 77} In proposition of law No. 4, Johnson claims that prosecutorial misconduct violated his right to due process and a fair trial.

{¶ 78} When this court reviews a claim of prosecutorial misconduct, the touchstone of our analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). This court considers two factors in its analysis: (1) whether the conduct was improper, and (2) if so, whether it prejudicially affected the defendant's substantial rights. *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 243. We analyze prejudice by determining the effect of the misconduct "on the jury in the context of the entire trial." *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

### 1. Misrepresentation of Evidence

{¶ 79} Johnson claims that the prosecutor allowed a state witness, Chief Detective McKinley Brown, to testify falsely during the 2011 hearing.

**{¶ 80}** At the first trial and again in 2011, Brown testified that when he questioned Johnson on November 15, 1997, he told Johnson that confessing would prove that he was not an unfeeling sociopath. In 1998, Brown testified that, in response, Johnson "broke down and starting crying, saying: Yes, I do care, I did kill her, and I'm sorry for it." But in 2011, Brown testified that Johnson responded by "out of the blue * * * [saying], I killed the bitch."

**{¶ 81}** On cross-examination, defense counsel asked Brown why he had "change[d]" his testimony about Johnson's response. Brown admitted that in 1998 he had not testified about Johnson saying, "I killed the bitch." But he objected to the suggestion that he was "changing the testimony." Brown said that his memory had not changed; he was simply including additional details that he had not felt it "appropriate to say" 14 years ago at trial. He commented that he should have testified to Johnson's exact words in the first trial.

**{¶ 82}** Johnson argues that the prosecutor committed misconduct "by falsely portraying Johnson's actions." More specifically, he alleges that the prosecutor knew that Brown was testifying incorrectly in 2011 and failed to correct the false statement. To prevail on this claim, Johnson must "show that '(1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false.' " *State v. Iacona*, 93 Ohio St.3d 83, 97, 752 N.E.2d 937 (2001), quoting *United States v. Lochmondy*, 890 F.3d 817, 822 (6th Cir.1989). Due process is violated if there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Lochmondy* at 822.

**{¶ 83}** Johnson cannot meet this burden. Brown's testimony in 2011 was somewhat inconsistent with his testimony in 1998. But the fact that a witness changes his story is not sufficient to establish perjury. *United States v. Lebon*, 4 F.3d 1, 2 (1st Cir.1993). Brown explained that he was merely providing additional information that he should have provided 14 years earlier. In addition, "mere inconsistencies in testimony by government witnesses do not establish knowing use

of false testimony" by the prosecutor. *Lochmondy* at 822; *see also State v. Widmer*, 12th Dist. Warren No. CA2012-02-008, 2013-Ohio-62, ¶ 41. Thus, Johnson cannot prove either that Brown's statement was false or that the prosecution knew that it was false.

### 2. *Disparaging Remarks*

{¶ 84} Johnson also alleges that prosecutorial misconduct occurred when the prosecutor made a disparaging remark about Marian Faulkner, Johnson's grandmother, during cross-examination.

{¶ 85} In 2011, Faulkner testified about her problems with alcohol while she was raising Johnson and his brother. Faulkner said that alcohol was more important to her than the children. She carried a flask with her everywhere, drove drunk, experienced blackouts, and beat Johnson if he bothered her during a hangover. Faulkner testified that although she did not realize it at the time, she was probably "a drunk" while she was raising Johnson.

{¶ 86} On cross-examination, the prosecutor pointed out that Faulkner had never mentioned having an alcohol problem when she testified in 1998 about Johnson's upbringing. According to Faulkner, she did not say anything about her alcoholism then because no one had asked.

{¶ 87} The prosecutor then questioned Faulkner extensively, impeaching her with her 1998 testimony. In that context, the following exchange occurred:

> [Prosecutor]: M'am, don't get me wrong. I think you are a very good lady, and I said that to you on the stand last time you testified. But I also believe that you will say anything to try to get this jury to ignore their oath.
>
> A: I wouldn't just say anything.
>
> [Defense counsel]: I would object to that.
>
> A: I wouldn't say anything. I'm going to tell the truth.

The court: It's cross-examination.

Johnson argues that the prosecutor's remark was disparaging and amounted to prosecutorial misconduct.

{¶ 88} Here, the prosecutor's comment—"I * * * believe that you will say anything to try to get this jury to ignore their oath"—followed a lengthy impeachment of Faulkner. The prosecutor had effectively established significant differences between her testimony in 1998 and 2011. As a result, he was in a position to question Faulkner about her truthfulness as a witness. *See*, *e.g.*, *State v. Mason*, 82 Ohio St.3d 144, 161, 694 N.E.2d 932 (1998). However, the prosecutor should have reserved any such comment for *closing argument*, not injected it into the middle of cross-examination. And the trial court could easily have cured this impropriety by promptly instructing the jurors that they were the sole judges of Faulkner's credibility. Instead, the court overruled defense counsel's objection.

{¶ 89} Johnson claims that the comment "effectively foreclosed the jury's consideration of mitigating evidence proffered by Johnson." But the prosecutor's statement did not prejudice Johnson when considered "in the context of the entire trial." *Keenan*, 66 Ohio St.3d at 410, 613 N.E.2d 203. The prosecutor's remark did undermine the defense's new mitigation evidence that Johnson was raised by an alcoholic. However, it did not foreclose the jury's consideration of Faulkner's testimony. Indeed, Faulkner promptly denied the prosecutor's assertion. She told the jury, "I wouldn't just say anything" before defense counsel could even object to the statement. She further insisted, "I wouldn't say *anything*. I'm going to tell the truth." (Emphasis added.) And when the prosecutor discussed the inconsistencies in Faulkner's testimony during closing arguments, he expressly advised the jurors that *they* were the sole judges of witness credibility. The trial court's jury instructions reiterated the same point.

**{¶ 90}** Considered in context, it is unlikely that the prosecutor's comment misled the jury or significantly diminished the strength of Faulkner's evidence about Johnson's childhood. The inconsistencies between Faulkner's testimony in 1998 and 2011 would have been apparent to the jurors even without the prosecutor's remark. We therefore hold that this did not amount to prosecutorial misconduct.

### 3. Closing Argument

**{¶ 91}** Johnson alleged one additional instance of prosecutorial misconduct during his oral argument before this court. He asserted that the prosecutor's closing argument in this case is on par with the closing argument described in *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.2d 818, ¶ 80-96, and thus rises to the level of prejudicial misconduct.

**{¶ 92}** Johnson did not raise any objection to the prosecutor's closing argument in his briefs, and the state did not even have an opportunity to address Johnson's claim at oral argument, because it was raised during rebuttal. Therefore, this argument has been waived, and we decline to address it on the merits. *See* App.R. 12(A)(1)(b) (reviewing court shall determine appeal on its merits based on briefs, record, and oral argument) and 16(A)(7) (appellant's brief must set forth argument in support of assignments of error).

**{¶ 93}** For these reasons, we reject proposition of law No. 4.

### D. Settled Issues

**{¶ 94}** In proposition of law No. 6, Johnson presents constitutional challenges to Ohio's capital-punishment scheme and argues that the death-penalty statutes violate international law and treaties. We summarily reject these claims, which have been resolved in our prior decisions. *See, e.g., Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, at ¶ 279-280.

**E. Cumulative Error**

{¶ 95} In proposition of law No. 7, Johnson urges the court to reverse his sentence on grounds of cumulative error and order a new trial.

{¶ 96} The cumulative-error doctrine provides that "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

{¶ 97} Here, Johnson cannot point to "multiple instances of harmless error." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). Nor does he explain how the alleged errors collectively deprived him of a fair trial or sentence. Accordingly, we reject proposition of law No. 7.

**F. Independent Sentence Evaluation**

{¶ 98} In proposition of law No. 5, Johnson argues that his death sentence was unreliable and inappropriate in light of the mitigating evidence presented. This claim dovetails with our obligation to independently review this death sentence for appropriateness. R.C. 2929.05(A).

{¶ 99} In conducting this review, we must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether death is the appropriate sentence in this case. *Id*.

*1. Aggravating Circumstances*

{¶ 100} In 1998, the jury convicted Johnson of two death-penalty specifications, both under R.C. 2929.04(A)(7): (1) aggravated murder during the course of an aggravated burglary and (2) aggravated murder during the course of an aggravated robbery. Johnson was also convicted of both underlying offenses:

aggravated burglary, R.C. 2911.11(A)(1), and aggravated robbery, R.C. 2911.01(A)(3). *Johnson*, 88 Ohio St.3d at 101, 114-115, 723 N.E.2d 1054.

{¶ 101} As we held in 2000, there is "sufficient and substantial evidence" to support the jury's finding of both aggravating circumstances. *Id.* at 114 (rejecting Johnson's sufficiency and manifest-weight challenges).

### 2. Mitigating Factors

{¶ 102} We must weigh the above aggravating circumstances against any mitigating evidence about "the nature and circumstances of the offense" and Johnson's "history, character, and background." R.C. 2929.04(B); *State v. Mammone,* 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 193. In addition, we must consider the statutory mitigating factors under R.C. 2929.04: (B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth), (B)(5) (lack of significant criminal history), (B)(6) (accomplice only), and (B)(7) (any other relevant factors).

### a. Johnson's mitigation hearing

{¶ 103} The Sixth Circuit Court of Appeals, in affirming the district court's granting of a writ of habeas corpus, faulted Johnson's 1998 trial counsel for failing to thoroughly investigate the circumstances of Johnson's childhood:

> The errors of Johnson's attorneys, particularly their lack of investigation, had a serious impact on the mitigation theory presented to the jury. Competent counsel could have put on evidence that "differ[ed] in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *Hill v. Mitchell,* 400 F.3d 308, 319 (6th Cir.2005). As the district court found, "not one witness testified about the abuse that [Johnson] and his brother suffered as a way of life," and the jury

"was misled into believing that [Faulkner] had raised [Johnson] properly and provided for his needs."

*Johnson v. Bagley*, 544 F.3d 592, 603-604 (6th Cir. 2008).

{¶ 104} Johnson presented significantly more mitigating evidence at his 2011 mitigation hearing than he did at his initial trial in 1998, particularly with regard to his family background and very difficult childhood. At the 2011 mitigation hearing, the defense presented five witnesses and Johnson's unsworn statement.

{¶ 105} Johnson's mother, Demeatra Johnson, and his maternal grandmother, Marian Faulkner, testified about his family background and childhood. Demeatra did not testify at the 1998 trial.

{¶ 106} According to Faulkner, everyone in her family drank alcohol frequently. Her mother enjoyed going to bars and drinking on weekends. Her father was an alcoholic and drug addict and he was periodically incarcerated. And her adoptive father drank often, physically abused her, and beat her mother. Faulkner's adoptive father and another male relative tried to molest her as a child.

{¶ 107} Faulkner began drinking at age 16, when her aunt took her to a bar. Eventually, she drank every morning and evening, taking liquor from home.

{¶ 108} Faulkner became pregnant with Johnson's mother when she was 17 years old, but she tried to abort the fetus herself and continued to drink alcohol. Demeatra was born early, weighing less than four pounds, and was incubated. Faulkner did not visit Demeatra for four or five days, and even when she did finally see her, she did not touch her. Faulkner relied on her mother for assistance in raising her child.

{¶ 109} Faulkner stated that she knows that she was a good parent to Demeatra, but she also admitted that she did not like her and that alcohol was always more important to her than parenting. Faulkner held a job, but she went to

26

a nearby bar every day and "drank [her] lunch" and returned to the bar again after work. According to Demeatra, Faulkner regularly went to bars, got drunk, and passed out. When drunk, Faulkner beat Demeatra, and she disciplined her with belts and cords. One night, Faulkner brought home a man who raped Demeatra.

{¶ 110} Demeatra was taking drugs by age nine, and she later sold drugs as well. She exchanged sex for drug money, rides in cars, and a place to stay. Demeatra was in and out of detention facilities as a teenager and frequently ran away.

{¶ 111} Demeatra became pregnant with Johnson at age 16. She reportedly consumed drugs and alcohol throughout the pregnancy, but Johnson's birth records do not indicate any health problems.

{¶ 112} Demeatra lived with her mother and grandmother for several months but then took Johnson (who was still a baby) to North Carolina with his father. They lived in a shack with no electricity or water, and they did not always have food or diapers. Demeatra regularly put Johnson in a closet if he cried, sometimes for an entire day. She mashed up Percocet, Percodan, or heroin and put it in Johnson's bottle or applesauce so he would sleep. She also gave him beer. Once Demeatra was angry with her boyfriend for beating her and Johnson, so she set the bed on fire while her boyfriend was in it.

{¶ 113} Demeatra and Johnson returned to Ohio a short time later. Demeatra was pregnant again and soon gave birth to Ronnie. Demeatra continued to do drugs and live a carefree life. Faulkner took care of her two grandsons, giving them food and shelter and sending them to school. Faulkner resented having to care for the boys, but she did not want them in foster care. She formally took custody in 1981.

{¶ 114} According to Faulkner, she had a "close and loving relationship" with Rayshawn and Ronnie. She tried to be a good parent, but she also said that alcohol was more important to her than the boys. According to Faulkner, she

carried a flask everywhere, regularly experienced pounding headaches, hangovers, and blackouts, and drove drunk. She recalls whipping the boys with a leather belt and an iron cord and hitting them with a bat when she was hung over. Faulkner said that she stopped drinking by the time Johnson was in middle school. However, she still has beer sometimes. Notably, Faulkner has never been convicted of driving under the influence, and although she did receive one speeding ticket in her life, she was not driving under the influence at the time. She also admitted that she did not say anything about having an alcohol problem when she testified in 1998.

{¶ 115} When Johnson was 12 or 13, Demeatra took a more active role in his life. She taught him how to drink, smoke marijuana, and cut, cook, and deal cocaine. They got high together. According to Faulkner, Johnson was out of control by this point. He disobeyed, caused trouble at school, stole, drank, and ran away. He was repeatedly in court, charged with offenses like drug abuse and stealing money from his great-grandmother. In November 1997, Faulkner threatened to put Johnson, who was living with her at the time, out of her house.

{¶ 116} After Johnson was arrested, he admitted to Faulkner that he had murdered Shanon. He cried, apologized, and said he needed help because he is crazy.

{¶ 117} Demeatra and Faulkner asked the jury to spare Johnson's life. Demeatra said that Johnson did not have a chance with her as his mother, and she blamed herself for his behavior. Faulkner emphasized that Johnson is a changed man, who has been "born again." If he is allowed to live, she believes that Johnson can be a mentor and help raise his 14-year-old son.

{¶ 118} Dr. Robert Smith, a forensic psychologist, obtained Johnson's family history, reviewed numerous records, met with Johnson twice, and administered tests.

{¶ 119} Smith described Johnson's family as "very dysfunctional." His great-grandmother, grandmother, and mother had become single mothers at very

young ages. Each had mental-health issues, abused alcohol, and neglected and abused her children. And in every case, the maternal grandmother became responsible for child-rearing, but then attempted to return the child when problems arose.

{¶ 120} Smith explained that this familial dysfunction likely caused a series of problems for Johnson, contributing to his mental-health problems and addiction. Johnson has low self-esteem and a sense of inadequacy because Demeatra neglected him. And he likely did not learn to connect with people because his mother and grandmother were addicts, and addicts commonly have difficulty showing affection to their children. Johnson was not taught the difference between right and wrong, did not learn to make good choices, and did not witness positive social interactions. Instead, Demeatra taught her son how to sell drugs, and Johnson observed her doing drugs and trading sexual favors for drug money. Furthermore, according to Smith, Faulkner was no better as a caregiver to Johnson than she had been to Demeatra. Smith conceded that there was no documented record of physical abuse against Johnson.

{¶ 121} Johnson has a low average IQ (83) and did not perform very well in school. For a time he took Ritalin for attention-deficit/hyperactivity disorder. The schools identified Johnson as developmentally handicapped and put him in a special class. He tended to work best in structured individual or small-group settings.

{¶ 122} Smith diagnosed Johnson with dependencies on alcohol and marijuana and with dysthymia, a form of depression most often found in people with dysfunctional family backgrounds. He explained that drugs and alcohol change the way one's brain functions and observed that it is common to suffer from both mental illness and addiction, each of which can affect the other. Johnson's past treatment for addiction was probably unsuccessful because he did not also receive help for his mental-health problems.

{¶ 123} Smith called Johnson's use of alcohol and drugs around the time of Shanon's death excessive. Johnson told Smith that he had a high tolerance for alcohol and drugs, reporting to Smith that he consumed a case of beer and smoked 15 "blunts"—described by Smith as cigars emptied of tobacco and loaded with marijuana—per day. On the morning Shanon died, Johnson woke up, smoked a blunt, and decided to rob the Markses' house. But he told Smith that he did not enter the house intending to hurt or kill anyone and that he thought Shanon was still alive when he left.

{¶ 124} Finally, Smith testified about Johnson's behavior following his conviction in 1998. While in prison, Johnson earned his GED and has held multiple jobs. He had received only two incident reports during 14 years of incarceration, and neither of them led to discipline.

{¶ 125} On cross-examination, Smith admitted that he did not document a diagnosis of depression when he first examined Johnson in 1999. He also acknowledged that his diagnosis differed from that of Dr. James Hawkins, the defense psychiatrist who testified at Johnson's first mitigation hearing. Hawkins had diagnosed Johnson with antisocial or sociopathic personality disorder. He had also testified that Johnson tended to exaggerate his symptoms, had an inflated opinion of himself, and lacked remorse.

{¶ 126} Rayshawn Johnson Jr., Johnson's 14-year-old son, testified that he loves his father deeply and visits him in prison. He stated that Johnson counsels him to avoid drugs, stay in school, keep out of trouble, and be godly. He wants to be able to continue to talk to his father. Rayshawn Jr. asked the jury not to impose the death penalty, saying, "That's all I got left."

{¶ 127} Nancy Bare testified about her work with Johnson through a prison ministry. Bare and Johnson met 11 times, beginning in January 2011, to pray, read scriptures, and discuss God. Bare asked the jury to spare Johnson's life because

she believes that "God has placed a call upon his life" to counsel and minister to others, including his son and other "young men who have turned the wrong way."

{¶ 128} Finally, Johnson made an unsworn statement, in which he accepted full responsibility for his actions and offered his "deepest and most sincere apology." He explained that he had been a different man 14 years before, one who relied on drugs and alcohol to escape reality. He had no father, only a drug-addicted mother who encouraged him to use drugs and alcohol. But now Johnson is sober and the Lord is in his life. He believes that he can mentor young men with addictions and help them learn to change. He is also trying to be a father to his son and has successfully counseled him against using drugs.

{¶ 129} Johnson said that Shanon did not deserve to die and that he wishes he could bring her back. He prays nightly for Shanon's family and understands that his apology is not nearly enough. Johnson asked for forgiveness and mercy and apologized again to both Shanon's family and his own.

### b. Weight of mitigating factors

{¶ 130} Johnson asks this court to assign weight to the following mitigating factors: his history and background, R.C. 2929.04(B); his age at the time of Shanon's murder, R.C. 2929.04(B)(4); and other factors such as Johnson's remorse, adjustment to life in prison, and his transformation since 1998, R.C. 2929.04(B)(7). Johnson does not contend, nor does the record indicate, that any other statutory mitigating factors apply.

{¶ 131} First, Johnson offered significant evidence of his troubling family history and childhood. Johnson's father was completely absent and his mother was often absent. When Demeatra was around, she was far from a positive role model. Demeatra's life apparently revolved around drugs and related activities, and she tended to run away from problems and responsibilities. She gave Johnson alcohol and drugs when he was a baby and she taught him to use and sell drugs as a teenager.

{¶ 132} As Johnson grew up, Demeatra both implicitly and explicitly taught her son a lifestyle of using drugs and consuming alcohol, selling drugs, and making questionable moral decisions. Johnson's mother and grandmother prioritized alcohol and/or drugs over raising him. Further, evidence suggests that they both had mental-health problems. This evidence is meaningful and is entitled to significant weight in mitigation. *See State v. Raglin*, 83 Ohio St.3d 253, 272, 699 N.E.2d 482 (1998).

{¶ 133} Second, Johnson argues that his youth at the time of the offense is mitigating. Johnson was 19 years old when he killed Shanon. We give this factor some weight. *See id.* at 273.

{¶ 134} Third, Dr. Smith testified that Johnson was impaired at the time of Shanon's murder as a result of his mental illness and addiction. Smith diagnosed Johnson with an alcohol dependency, a marijuana dependency, and dysthymia, a form of depression. And Johnson reported that he was under the influence of marijuana on the morning of his crime. As Smith conceded, however, the accuracy of his diagnoses turned on the veracity of the information he received from Johnson, his mother, and his grandmother. This evidence is entitled to some weight under R.C. 2929.04(B)(7). *See State v. Tibbets*, 92 Ohio St.3d 146, 174, 749 N.E.2d 226 (2001) ("Although voluntary intoxication is not a strong mitigating factor, * * * we have accorded some weight to drug addiction in mitigation").

{¶ 135} Fourth, Johnson has a low average IQ and generally did not do well in school. As a child he was diagnosed with both attention-deficit/hyperactivity disorder and a developmental disability. Johnson's limited intellectual abilities are entitled to some weight in mitigation under R.C. 2929.04(B)(7). *See State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 264.

{¶ 136} Finally, Johnson argues that he is "a different person than the teenager who committed this horrible crime." He has behaved well during his 14 years on death row. He has also converted to Christianity and expresses a strong

desire to help other young men. Johnson has had a positive impact on his teenage son and wants to continue to develop that relationship. Johnson also expressed genuine remorse for killing Shanon, both at his initial trial and at the 2011 mitigation hearing. This evidence is entitled to some weight as an "other factor" under R.C. 2929.04(B)(7).

### 3. Weighing

{¶ 137} We accord great cumulative weight to the mitigating factors present in this case. Johnson's family background is similar to that of the defendant in *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, in which we reversed the death sentence based upon the presence of R.C. 2929.04(B)(7) "other factors" that "strongly militate[d] against imposing the death sentence." *Id*. at ¶ 105-106. Like Tenace, Johnson was "doomed from the start" due to his upbringing. *Id.* at ¶101. Both Johnson's mother and his grandmother had mental-health issues and were addicted to alcohol, and his mother was also addicted to drugs. They neglected and physically abused Johnson during his childhood. The few lessons Johnson's mother passed on to her son concerned how to abuse drugs and lead a criminal lifestyle.

{¶ 138} Johnson's age at the time of the murder, 19, means that he was not far removed from that corrosive upbringing when he committed the crime. He suffered from mental illness and addiction and had limited intellectual ability. There is evidence that as Johnson has aged and been part of a structured prison environment, he has changed. Johnson has expressed sincere remorse for his crimes, and he has not been subject to any discipline for misbehavior while he has been in prison.

{¶ 139} Johnson murdered his neighbor while stealing approximately $50 from her house in the course of an aggravated robbery and an aggravated burglary; nothing excuses the senseless killing of an innocent person. Any one of the mitigating factors standing alone would not outweigh the aggravating

circumstances in this case. But when viewed cumulatively, the mitigation evidence militates against imposing the death sentence.

**{¶ 140}** Thus, based upon an independent review of the evidence, we cannot conclude that the aggravating circumstances that Johnson was found guilty of committing outweigh beyond a reasonable doubt the mitigating factors present in the case. R.C. 2929.05(A). The sentence of death imposed by the trial court is not appropriate in this case.

## III. CONCLUSION

**{¶ 141}** Accordingly, we vacate the sentence of death and remand the cause to the trial court for resentencing consistent with R.C. 2929.06.

Judgment vacated,<br>and cause remanded.

O'C<small>ONNOR</small>, C.J., and L<small>ANZINGER</small> and O'N<small>EILL</small>, JJ., concur.

O'D<small>ONNELL</small>, K<small>ENNEDY</small>, and F<small>RENCH</small>, JJ., dissent.

––––––––––––––––

**O'D<small>ONNELL</small>, J., dissenting.**

**{¶ 142}** Respectfully, I dissent.

**{¶ 143}** The aggravating circumstances in this case outweigh the mitigating factors beyond a reasonable doubt, and the sentence of death imposed in this case is not excessive or disproportionate to the penalty imposed in similar cases. Accordingly, I would affirm the judgment of the trial court.

### Independent Sentence Review

R.C. 2929.05(A) specifically directs that in cases involving the imposition of capital punishment, this court

> shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating

circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate.

The statute provides that, in determining whether the sentence of death is appropriate, this court "shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." *Id.* Further, it mandates that this court

> review all of the facts and other evidence to determine if the evidence supports the finding of the aggravating circumstances the trial jury * * * found the offender guilty of committing, and shall determine whether the sentencing court properly weighed the aggravating circumstances the offender was found guilty of committing and the mitigating factors.

*Id.*

### *Aggravating Circumstances*

{¶ 144} In our review of the first appeal filed in this case in *State v. Johnson*, 88 Ohio St.3d 95, 723 N.E.2d 1054 (2000), we referenced the following facts:

> In order to commit a theft offense in the Markses' home, [Johnson], using stealth, entered the home through the back door, wearing gloves and armed with a ball bat. He knew that the house was occupied, since he could see into the bathroom of the Markses' home. While in the home, he beat Shanon with a ball bat, causing her death. He then proceeded to a bedroom, where he found

> Shanon's purse on a bed. He emptied the contents of the purse and
> took her money.

*Id.* at 114. We noted that in his statements to police, Johnson confessed to entering Shanon's home to look for money, striking her twice in the back of the head with a baseball bat, and hitting her again after she fell to the floor. *Id.* at 99-100. He also admitted hearing Shanon cry for help as he left the scene, *id*. at 99, and an autopsy revealed that she had suffered defensive wounds, a broken left forearm, and massive head injuries, including lacerations to her brain that caused her death, *id*. at 97-98. The crime scene photos, we explained, showed that Shanon had been severely beaten and rebutted Johnson's claim that he only struck her three times. *Id.* at 117-118.

{¶ 145} R.C. 2929.04 describes the death penalty specifications to be included in an indictment and provides:

> (A) Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:
>
> * * *
>
> (7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

**{¶ 146}** We have previously affirmed the jury's finding of two R.C. 2929.04(A)(7) aggravating circumstances in this case, holding that the record "clearly supports the finding that [Johnson] was the principal and sole offender in the commission of [the] aggravated murder [of Shanon Marks] while committing an aggravated burglary and aggravated robbery." *Johnson*, 88 Ohio St.3d at 122, 723 N.E.2d 1054.

**{¶ 147}** This prior holding remains the law of the case. *See State v. Davis*, 139 Ohio St.3d 122, 2014-Ohio-1615, 9 N.E.3d 1031, ¶ 27 ("The law-of-the-case doctrine provides that the ' "decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels" ' "), quoting *Hubbard ex rel. Creed v. Sauline*, 74 Ohio St.3d 402, 404, 659 N.E.2d 781 (1996), quoting *Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984).

*Mitigating Factors*

**{¶ 148}** Regarding mitigating factors, R.C. 2929.05(A) and 2929.03(D)(1) require that we review and independently weigh all facts and other evidence and consider the offense and the offender to determine whether the aggravating circumstances outweigh the mitigating factors in the case beyond a reasonable doubt. R.C. 2929.04(B) catalogs mitigating factors that include the nature and circumstances of the offense; the history, character, and background of the offender; whether the victim induced or facilitated the offense; whether it is unlikely that the offense would have been committed but for the offender being under duress, coercion, or strong provocation; whether the offender, at the time of committing the offense, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law; the youth of the offender; the offender's lack of a significant history of prior criminal convictions and delinquency adjudications; if the offender participated in the offense but was not the principal offender, the

degree of his participation in the offense and acts that led to the victim's death; and any other factors relevant to the issue of whether the offender should be sentenced to death.

{¶ 149} As the majority recognizes, however, only the following statutory factors receive weight in mitigation of punishment in this case: (1) Johnson's history and background, which included a lack of parental support, physical abuse, and exposure to drugs and alcohol, (2) Johnson's age at the time of the offense—19, and (3) the catchall provision for other relevant factors, i.e., Johnson (a) suffered from alcohol and marijuana dependency at the time of the offense, (b) suffered from depression at the time of the offense, (c) has limited intellectual abilities, (d) made an unsworn expression of remorse, (e) embraced religion, (f) desires to help young men with addictions, (g) demonstrated good behavior on death row, and (h) has a positive relationship with his son. R.C. 2929.04(B); *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 158, 160 (history of drug and alcohol abuse and unsworn expressions of remorse considered); *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 261 (history of mental problems and low average intelligence considered); *State v. Smith*, 89 Ohio St.3d 323, 328, 731 N.E.3d 645 (2000) (stating that religious conversion is a mitigating factor).

*Weighing of Aggravating Circumstances and Mitigating Factors*

{¶ 150} In other cases, this court has previously considered the same mitigating factors that are present in this case and concluded that they are not entitled to substantial, significant, or great weight. *See State v. Goodwin*, 84 Ohio St.3d 331, 350, 703 N.E.2d 1251 (1999) (offender's age of 19 entitled to "nominal weight"), *habeas corpus granted in part on other grounds sub nom. Goodwin v. Johnson*, N.D.Ohio No. 1:99CV2963, 2006 WL 753111 (Mar. 22, 2006); *State v. Davis*, 139 Ohio St.3d 122, 2014-Ohio-1615, 9 N.E.3d 1031, ¶ 113 (retrospective remorse entitled to little weight); *State v. Cunningham*, 105 Ohio St.3d 197, 2004-Ohio-7007, 824 N.E.2d 504, ¶ 138 (defendant's severe depression was a weak

mitigating factor); *State v. Green*, 66 Ohio St.3d 141, 152, 154, 609 N.E.2d 1253 (1993) (defendant's lack of intelligence, alcohol and drug addiction, and family upbringing, which included frequent physical abuse by an alcoholic father, collectively "entitled to modest weight").

{¶ 151} This court has " 'seldom given decisive weight to' a defendant's unstable or troubled childhood." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 245, quoting *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 265.

{¶ 152} There is nothing mitigating about the nature and circumstances of the murder of Shanon Marks. Johnson prepared for the crime by wearing gloves to avoid leaving fingerprints, armed himself with a baseball bat which he intended to use as a weapon, entered the home by stealth, used the bat to kill Shanon, and struck her with enough force to fracture her skull and a bone in her left forearm, rupture her right eye, tear one of her ears, and cause lethal lacerations in her brain. He then emptied the contents of her purse to "make it look like a robbery," stole her money, ignored her cries for help, and left her to die on a bathroom floor while he disposed of the evidence to avoid being connected to the attack.

{¶ 153} The majority errantly compares this case to an outlier case, *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, in which this court, in a 4-3 decision, vacated a sentence of death holding that an R.C. 2929.04(A)(7) aggravating circumstance did not outweigh the mitigating factors, emphasizing the defendant's history and background. *Id.* at ¶ 101-103, 106.

{¶ 154} *Tenace* is distinguishable from this case because Johnson's unfortunate family history does not rise to the level of depravity experienced by Troy Tenace, who was forced to watch the sexual abuse of his sister for approximately 15 years and whose mother sold him as a child to adult males for sexual purposes in addition to helping him and his siblings burglarize stores and homes. *Tenace* at ¶ 70, 84, 87, 102. Tenace's earliest memory was of his mother's

face coming through a motel window. *Id.* at ¶ 86. His parents each kidnapped him during a drawn out custody fight. *Id.* at ¶ 102. His mother, a drug addict, attempted suicide several times and spent six weeks in a mental hospital. *Id.* at ¶ 101. Tenace suffered from posttraumatic stress disorder, depression, substance dependence disorder (in particular with cocaine), and antisocial personality disorder. *Id.* at ¶ 93-95.

{¶ 155} Johnson's history, character, and background does not rise to the sort of family upbringing Tenace experienced. Rather, this case is more analogous to *State v. Spivey*, 81 Ohio St.3d 405, 692 N.E.2d 151 (1998), and *State v. Raglin*, 83 Ohio St.3d 253, 272-273, 699 N.E.2d 482 (1998).

{¶ 156} Warren Spivey broke into Veda Eileen Vesper's residence, attacked her with a knife or knives, inflicted multiple stab wounds, beat her to death, robbed her of jewelry and other personal property, and fled in her automobile. *Spivey* at 405. We held that the state proved one R.C. 2929.04(A)(7) aggravating circumstance beyond a reasonable doubt. *Id.* at 420. The nature and circumstances of the offense in *Spivey* revealed nothing of mitigating value, and the only applicable mitigating factors were the offender's history and background, youth (age 19 at the time of the offense), and psychological problems (attention deficit disorder, alcohol and marijuana abuse/possible dependency, borderline personality disorder with schizoid and antisocial features). *Id.* at 422, 424, 428.

{¶ 157} Spivey "was plagued by physical and mental problems or deficiencies, had difficulties in school, suffered parental rejection at an early age, was raised in an unsupportive family environment, was treated as an outcast by certain family members, was physically and verbally abused by his parents, and was sexually abused on at least one occasion." *Id.* at 424. His mother resented his medical and behavioral problems to the point that she stopped seeking medical treatment for his seizures, which as he matured, began to manifest themselves in

forms of rage and anger. *Id.* at 420. This court affirmed his sentence of death. *Id.* at 429.

**{¶ 158}** Walter Raglin approached Michael Bany from behind in a parking lot, pulled out a .380 semiautomatic pistol, demanded and received Bany's cash—$60—inquired as to whether Bany's vehicle had an automatic or manual transmission, and when Bany failed to answer and turned toward Raglin, he shot Bany in the side of the neck, killing him. *Raglin* at 254. We held that the state proved one R.C. 2929.04(A)(7) aggravating circumstance beyond a reasonable doubt. *Id.* at 266-267. The nature and circumstances of the offense revealed nothing of mitigating value; the applicable mitigating factors were the offender's history and background, youth (age 18 at the time of the offense), expressions of remorse and sorrow, cooperation with police, and the fact that Raglin may have, due to a mental disease or defect, lacked the capacity to conform his conduct to the requirements of the law. *Id.* at 272-273.

**{¶ 159}** Raglin "lacked appropriate parental support and guidance, his family life was chaotic, the conduct of his mother was reprehensible, and the resulting situations [he] was subjected to during his formative years [were] nothing short of atrocious." *Id.* at 272. He lived in homes characterized by extreme filth and inadequate facilities. *Id.* at 267. His father was incarcerated on several occasions for drug-related offenses. *Id.* His mother often abandoned him and his siblings for days or a week at a time and spent some nights in jail for prostitution. *Id.* The major bonding between Raglin and his mother during his childhood centered on alcohol and drug use. *Id.* at 269. When Raglin was around age nine, his mother permitted him to drink alcohol and smoke cigarettes and began to have him steal money to support her drug habit. *Id.* at 267. During his preteen years, Raglin accompanied his mother to drug deals as a form of protection for her. *Id.* at 268.

{¶ 160} Although the combined mitigating factors in *Raglin* were "stronger than the mitigation we typically see in some appeals involving the death penalty," we affirmed the sentence of death. *Id.* at 274, citing *Spivey*.

{¶ 161} Johnson, Raglin, and Spivey all committed their offenses before they reached 20 years old. All three men had troubled childhoods. Like Spivey, Johnson experienced parental rejection and physical abuse. And like Raglin, Johnson suffered from the substance abuse by the adults in his life. The major bonding between Johnson and his mother centered on drugs and alcohol, and his mother encouraged him to engage in criminal behavior.

{¶ 162} In *Spivey* and *Raglin*, the offenders' youth, history, and other mitigating factors did not overcome a single R.C. 2929.04(A)(7) aggravating circumstance. *Spivey* at 429; *Raglin* at 274. Here, there are two aggravating circumstances: Johnson committed aggravated murder during the course of an aggravated burglary and an aggravated robbery and Johnson was the principal offender in murdering his neighbor by beating her with a baseball bat. He left Shanon crying for help and without medical attention, having struck her from behind and inflicted massive head injuries. The aggravating circumstances are entitled to significant weight.

{¶ 163} The mitigating factors, however, are entitled to nominal, little, weak, or modest weight according to our case law, and the combination of mitigating factors is insufficient to overcome the great weight of the aggravating circumstances in this case. The analysis offered by the majority is not persuasive, and its reliance on *Tenace* is misplaced because that case is factually distinguishable from the mitigation present here and it ignores that our precedent affords little weight to the mitigating factors present in this case.

{¶ 164} The aggravating circumstances Johnson was found guilty of committing outweigh the mitigating factors in this case beyond a reasonable doubt.

*Appropriateness and Proportionality*

{¶ 165} The death penalty is not excessive punishment in this case and is proportionate to death sentences imposed in other cases. *Johnson*, 88 Ohio St.3d at 123, 723 N.E.2d 1054. *See Spivey*, 81 Ohio St.3d 405, 692 N.E.2d 151; *Raglin*, 83 Ohio St.3d 253, 699 N.E.2d 482.

*Conclusion*

{¶ 166} The evidence presented in this case supports the jury's finding of two aggravating circumstances, i.e., Johnson was the principal offender in the commission of an aggravated murder while committing aggravated burglary and aggravated robbery. The aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, and the sentence of death is not excessive and is proportionate to the penalty affirmed in similar cases.

{¶ 167} For these reasons, I would affirm the judgment of the trial court and its imposition of sentence in this case.

KENNEDY and FRENCH, JJ., concur in the foregoing opinion.

_____

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Ronald W. Springman Jr., Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, Linda Prucha, Supervisor, Death-Penalty Division, and Tyson Fleming and Daniel Jones, Assistant Public Defenders, for appellant.

_____