[Cite as *State v. Wade*, 2018-Ohio-976.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 16AP-674 |
| v. | : | (C.P.C. No. 15CR-6266) |
| Jordyn Wade, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

---

### D E C I S I O N

#### Rendered on March 15, 2018

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert.*

**On brief:** *The Law Office of Thomas F. Hayes, LLC*, and *Thomas F. Hayes*, for appellant. **Argued:** *Thomas F. Hayes.*

---

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Defendant-appellant, Jordyn Wade, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to jury verdicts finding him guilty of multiple counts of aggravated murder, murder, attempted murder, aggravated burglary, aggravated robbery, kidnapping, and associated firearm and criminal-gang specifications. A separate entry reflects conviction on a single count of having a weapon while under disability, an offense that was tried to the court.

{¶ 2} The charges against Wade arose out of a quadruple homicide that took place in a residence on East Hudson Street in Columbus, Ohio, in the early morning hours of

June 13, 2015. A fifth victim, a teenage girl, survived a gunshot wound to her head and presented the state's prime testimony at trial.

{¶ 3} The surviving witness, T.N., testified that she was 17 years old at the time of trial, which took place approximately one year after the murders. On the evening of June 12, 2015, T.N. and her half-sister Tyajah decided to spend the night at the home of Michael Ballour, Tyajah's father. Ballour's friend, Daniel Sharp, was at the home. It was not unusual for T.N. and Tyajah to socialize and spend the night at Ballour's home. Upon their arrival at the house, Ballour gave Tyajah a new cell phone in anticipation of Tyajah's upcoming graduation.

{¶ 4} T.N. and Tyajah both fell asleep on a couch in the front room around midnight, but were awoken at approximately 3:30 in the morning by the entry of Robert Adams, whom T.N. knew from prior occasions as Rob, and two other individuals whom she did not recognize. Adams introduced these individuals to T.N. as "Wizzle" and "Angela."

{¶ 5} T.N. identified Wade at trial as the individual introduced to her as Wizzle on the night in question. Other testimony established that Angela was Angela Harrison, one of the four homicide victims.

{¶ 6} Shortly after this group arrived, T.N. and Tyajah stated that they were hungry, so Ballour suggested that Adams accompany them to get something to eat. Adams declined and suggested that Wade take the girls instead. Wade took T.N. and Tyajah to a Waffle House and then a McDonald's before returning to Ballour's house with food. Upon returning, they found a woman named Sabrina Turner present in the house. Turner left the premises shortly thereafter.

{¶ 7} T.N. and Tyajah ate their food on the couch while Wade stayed outside on the porch. Shortly thereafter, Adams and Ballour began to argue. Ballour attempted to leave the premises, but Adams dissuaded him. Adams summoned T.N. and Tyajah from the front room to the kitchen, where T.N. found Adams holding Ballour and Sharp at gunpoint. Adams ordered the four of them to the floor, and yelled for Wade to come in from the porch. Wade entered the kitchen, also holding a gun. When Adams ordered Ballour and Sharp to "[g]ive us everything that you have," Sharp gave Adams some cocaine. (Tr. at 268.) Ballour told Adams that he had something upstairs, and Adams sent Wade to retrieve this. Adams

then announced to all of them that it would be too loud if they were shot in the kitchen, and ordered everyone to the basement.

{¶ 8}  As T.N., Tyajah, Sharp, and Ballour descended the stairs, Adams ordered them to floor.  T.N. observed that the woman who had arrived with Wade and Adams, Angela, was already in the basement hiding behind the washing machine.  Wade, still holding his gun, descended into the basement and stood at the bottom of the stairs.  At this point, Adams asked Wade "[s]hould I off them all?"  Wade answered "yes."  (Tr. at 272.)  Adams then shot Sharp in the head.  T.N. was close enough to see blood running down the chair where Sharp's head lay.  Wade was still standing in the basement at the time of this gunshot.

{¶ 9}  Adams then ordered Ballour to put his head under a pillow, putting his gun in Tyajah's face and threatening to shoot her in front of Ballour if Ballour did not comply.  Ballour did not immediately cooperate, and said "I am not going to let you kill me in front of my kids."  (Tr. at 275.)  Adams then shot Ballour in the shoulder.  Ballour got up and began wrestling, unsuccessfully, for the gun, then tried to flee up the basement stairs.  Adams kept firing and Ballour collapsed onto the stairs.

{¶ 10} Adams then shot Angela in the head while she begged for her life, and shot Tyajah, who was also pleading for her life.  Turning to T.N., he shot T.N. once in the back of the head.  The bullet travelled through T.N.'s scalp, exited, and removed the top of her ear.  Unsure of the severity of her own injuries and those of the other victims, T.N. lay motionless until Adams went back up the stairs.  T.N. tried unsuccessfully to wake her sister, then again lay motionless and held her breath when someone came back down the stairs.  She was unable to identify this person because she could not look without betraying the fact that she was alive.  She heard someone pacing around the basement for a brief period, and then heard someone say from the top of the stairs "[c]ome on, cuz."  (Tr. at 279.)  The person in the basement thereupon ran back up the stairs and T.N. deduced from the sound of the back door shutting that both men had left the house.

{¶ 11} Making her way over Ballour's body lying on the basement steps, T.N. cautiously left the basement.  She noted that Tyajah's new cell phone was missing from the place where they had placed it to charge the night before.  T.N. exited the house through the front door and found a young man on the street, whom she asked to call the police.

{¶ 12} After the police arrived, T.N. was taken to the hospital and treated for her gunshot wound. Medical personnel removed bullet fragments from her head wound and completed removal of the portion of her ear damaged by the bullet. Later, T.N. discovered more bullet fragments in her hair extensions and turned these over to police.

{¶ 13} At this point in the testimony, T.N. identified photographs showing the bodies as they appeared in the basement, the general state of the house, and the red SUV driven by Wade on the night in question. She also was asked to review a video taken by the Waffle House surveillance system, and identified herself, her sister, and Wade as persons present. She also described the distinctive white-and-red cell phone case Wade used on the night of the shootings, and identified that cell phone as an exhibit.

{¶ 14} T.N. then testified regarding her review of two photo arrays presented by investigating officers. For the first array of six photographs, she presented a written statement " '[n]one of the photos look familiar. No. 2 is the closest.' " (Tr. at 296.) On the second array, she identified Wade as "Wizzle" from the six photographs presented: "No. 2 is who I recognize as the one that was involved in the shooting." (Tr. at 297.) From a third photo array, she picked out Adams. T.N. then made a courtroom identification of defendant as the "Wizzle" she had seen at the crime scene and identified from the photo array.

{¶ 15} Officer Darrell Fitzpatrick, of the Columbus Division of Police, testified that he responded to a radio report of a woman in distress in the vicinity of Hudson Street and Cleveland Avenue. There were other officers already present at the house, so Officer Fitzpatrick directed his attention to T.N., who stated that she had been shot in the head. Officer Fitzpatrick accompanied her a short distance to where medical personnel were located, in order to get T.N. away from the scene, which was not yet secure. T.N. described the situation preceding and during the shooting at Ballour's house, and stated that she had survived by "playing dead." (Tr. at 66.) Officer Fitzpatrick stayed with T.N. while she was treated at the scene and then transported to Grant Hospital, until other investigating officers came to the hospital.

{¶ 16} Officer Steven Shope, of the Columbus Division Police, testified regarding his response to the crime scene immediately after the shooting. Upon arrival, he found a young female victim already attended to by other personnel, so he and another officer went into

the home identified as the scene of the shooting. As the first officers to enter the unsecured scene, they entered with guns drawn, unsure of the situation. While other officers cleared the second floor, Officer Shope noticed that the door in the kitchen leading to the basement stairs was open and a male with an apparent bullet wound to the head lying face down on the steps. The officers proceeded downward past the body on the steps and discovered three more victims, all shot in the head and all dead, including one victim squeezed into a small space between the clothes washer and wall. Officer Shope did not notice any sign of forced entry or damage to the door when he entered the property.

{¶ 17} Officer Daniel Yandrich, of the Columbus Division of Police, corroborated Officer Shope's testimony regarding their initial entry on the crime scene. Officer Yandrich was the first officer to arrive and he saw an injured female standing with another male, and she indicated the house on Hudson where the shooting occurred. On entering the house with Officer Shope, he noticed blood on the door, which Officer Yandrich assumed was from T.N. leaving after being shot. In the basement, the officers noted spent shell casings on the floor, an unspent round, and bullet strikes into woodwork. They turned the scene over to crime scene investigators.

{¶ 18} Detective Kevin Jackson, of the Columbus Division of Police, testified that he was a member of the crime scene search unit assigned to the case. He corroborated the other officers' testimony regarding the position of the bodies and the distribution of blood across the stairs and basement floor. He collected spent shell casings and noted bullet strikes on appliances and woodwork.

{¶ 19} The crime scene investigators collected food and beverage containers, cigarette butts, and swabs of blood and organic matter for DNA sampling. After analysis, these failed to provide useful information. The fingerprints collected at the scene were likewise inconclusive.

{¶ 20} Detective Robert Connor, of the Columbus Division of Police, testified that he was assigned to the homicide division and was the lead detective on the case. Based on a brief report by another investigator, who had spoken with T.N., Detective Connor began with the information that T.N. could identify a known individual by the name of Rob, and an individual that she had met for the first time that night and known to her only as Wizzle.

{¶ 21} Information obtained by patrol officers from confidential informants led Connor to identify Wade as the Wizzle in question. Based on this information, he compiled photo arrays from which T.N. selected Wade as Wizzle. Investigators obtained a warrant and arrested Wade. At the time of arrest, they secured Wade's cell phone and shoes. While the cell phone was later identified by T.N. as matching the one she had seen on the night in question, the shoes did not provide a useful match to bloody footprints at the scene of the crime.

{¶ 22} Based on information obtained from Wade's cell phone, and T.N.'s identification of a person named "Rob" as the other gunman, other officers executed a search warrant for Robert Adams. They failed to apprehend Adams but did secure Adams' cell phone and some of his clothing. The searchers also obtained and impounded an Isuzu SUV that matched the description given by T.N., including detailed descriptions of interior wear and upholstery rips. Investigators then obtained surveillance video from Waffle House and McDonald's on the night in question.

{¶ 23} Sabrina Turner testified regarding her experiences just before the slayings. She stated that on that night she went to Ballour's house, hoping to obtain and smoke crack cocaine. She was a frequent visitor at the house for that purpose. When she arrived, a man she knew as Robbie was present, as well as Sharp and Ballour. Later, two girls arrived with another man. She recognized one as Ballour's daughter, but did not know the other. Turner identified Wade in open court as the individual who arrived with the two girls.

{¶ 24} The trio were carrying Waffle House food packages when they arrived. Turner thereafter went upstairs with Ballour briefly to smoke crack cocaine, and then came back downstairs and left the house. She went around the corner to an acquaintance's house and dozed off on the couch. Eventually, she returned to the vicinity of Ballour's house because she heard that five people had just been killed there. She approached police at the scene to ask what had happened, but did not immediately tell them what she knew of the events preceding the shootings. Later, two police officers stopped her on the street, whereupon she described what she knew.

{¶ 25} Turner testified that she knew "Robbie" from prior encounters, but had never seen Wade. At the time she left the house, there appeared to be no conflict among the persons present. On cross-examination, Turner described her own ongoing drug problems.

She stated that her own pending misdemeanor charges on unrelated offenses were not a factor in her decision to testify in the case.

{¶ 26} Tolliver Cunningham testified that he was the individual who first spoke to T.N. and assisted her when she approached him on the street after the shooting. He did not know T.N. at the time, but she waved at him and appeared in distress. As he came closer he saw that she was covered in blood. T.N. immediately said that she needed help and there were dead persons in the basement of a nearby house. T.N. was sobbing and shaking badly. Cunningham let T.N. use his phone to call her mother, at which time T.N. began to faint. Cunningham retrieved his phone and spoke with T.N.'s mother. Cunningham began yelling for help, but several onlookers who were observing from their porches refused to intervene. Holding T.N. in his arms, he flagged down a passing police car. Cunningham explained to the police that he did not know more about what was going on beyond his interaction with T.N.

{¶ 27} The state presented cell phone tower analyses to establish that, between 3:30 a.m. and 8:00 a.m. on the morning of the shooting, calls to and from Wade's cell phone were relayed to cell phone towers near the crime scene, near a McDonald's restaurant on 17th Avenue, and near the Waffle House restaurant on Cassidy Avenue. Some of these calls were made to Adams' cell phone, which was using the same cell towers.

{¶ 28} In order to support the gang specifications in the indictment, the state also presented police testimony to establish that Wade was a known member of certain gangs. This testimony will be examined in more detail below in the discussion of Wade's second assignment of error.

{¶ 29} The defense rested without presenting witnesses.

{¶ 30} The jury returned guilty verdicts on all counts and specifications except for an acquittal for one aggravated robbery count. The guilty verdicts included two forms of aggravated murder with respect to each deceased victim, two forms of murder for each deceased victim, one count of attempted murder with respect to T.N., aggravated robbery with respect to each victim except Angela Harrison, one count of kidnapping with respect to each victim, and firearms and gang-related specifications. On the sole count tried to the bench, the trial court found Wade guilty of one count of having a weapon under disability.

After merging counts where appropriate, the trial court sentenced Wade to a total of 172 and one-half years to life in prison.

{¶ 31} Wade has timely appealed and brings the following assignments of error:

[1.] Jordyn was deprived of his constitutional right to a fair trial when the court (1) overruled the defense objection to incorrect police testimony that blood was found on Jordyn's shoes and that the blood matched that of Michael Ballour, and failed to ever strike that testimony from the record, (2) failed to immediately inform the jury that the testimony is incorrect, and (3) later failed to instruct the jury that the jury was required to accept a "corrective" stipulation of the parties.

[2.] The convictions on the "criminal gang" specifications are not supported by the sufficient evidence and are contrary to the manifest weight of the evidence.

[3.] The Court overruled the defense's objection to evidence of prior bad acts allegedly committed by Jordyn.

[4.] Jordyn was deprived of his constitutional right to effective assistance of counsel.

[5.] The convictions on Counts 2 and 6 are not supported by sufficient evidence and are contrary to the manifest weight of the evidence.

[6.] The trial court sentenced Jordyn to an effective life sentence without the possibility of parole, without making the required factual finding that any of Jordyn's offenses are "homicide offenses" for Eighth Amendment purposes.

[7.] The trial court sentenced Jordyn to an effective sentence of life imprisonment without the possibility of parole, without adequately considering Jordyn's "youth and its attendant characteristics" and without finding that Jordyn's crimes do not reflect "transient immaturity."

[8.] The trial court failed to consider Jordyn's youth as a mitigating factors.

[9.] Clerical error in sentencing entry.

[10.] Clerical error in sentencing entry.

{¶ 32} Wade's first assignment of error alleges that certain testimony of Detective Connor constituted knowing use of false or perjured testimony, and thus a denial of due process pursuant to *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.1989). "To establish a denial of due process from the use of false testimony or false evidence, [the defendant] must show: (1) the statement was false; (2) the statement was material; and (3) the prosecutor knew it was false." *State v. Howard*, 10th Dist. No. 15AP-161, 2016-Ohio-504, ¶ 40. Even if the state has not solicited the false evidence, there may be a denial of due process where the state allows it to go uncorrected when it appears. *Id.* at ¶ 40, citing *Lochmondy* at 822. "Due process is violated if there is a 'reasonable likelihood that the false testimony could have affected the judgment of the jury.' " *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, ¶ 82, quoting *Lochmondy* at 822.

{¶ 33} The testimony in question is as follows:

> Q. You took the tennis shoes from Jordyn Wade when he was arrested, right?
>
> A. Yes, I did.
>
> Q. And compared them to the prints that they found in the kitchen floor?
>
> A. Correct.
>
> Q. And there is not a match?
>
> A. No, it was not.
>
> Q. Did they do any analysis on the bottom of the shoes, of those shoes to see if there was any blood on there that might match up to the victims?
>
> A. Yes, they did.
>
> Q. And that was not a match?
>
> A. It was a match to Michael Ballour's blood.

(Tr. at 389-90.)

{¶ 34} After the defense objected to this testimony, which manifestly surprised both prosecution and defense with an apparent assertion that there was a match between blood

from a victim and blood found on Wade's shoes at the time of his arrest, the prosecution and defense agreed that the  following stipulation be read to the jury:

> "Stipulations between the parties.  No. 1:  If Matthew Cogleton from BCI & I were called to testify, he would state that he compared the shoe lift in the kitchen floor to the shoes collected from Jordyn Wade and there was no match.["]

> "No. 2: Detective Connor testified that there was a match of the blood found at the scene.  This is, in fact, true.  However, it is a match of the blood at the scene to Michael Ballour's blood standard and no blood was found on the bottom of Jordyn Wade's shoe.["]

(Tr. at 570.)

{¶ 35}  The record simply does not support any attempt to intentionally mislead the jury, and to the extent that Detective Connor's testimony was misleading, prosecution did not allow it to go uncorrected.  Reviewing Detective Connor's pertinent testimony made while under cross-examination by Wade's counsel, the detective began with a clear and unequivocal statement that Wade's shoes did not match the bloody footprints at the scene of the crime. Immediately thereafter, defense counsel asked if there was blood found on Wade's shoes and whether it matched any of the victims. Detective Connor replied that there was a match with the blood of Michael Ballour.  A fair reading of Detective Connor's testimony, in light of other testimony by him and other investigators regarding the general lack of physical evidence linking Wade to the scene, is that the detective misunderstood and answered a question that had not been asked, i.e., was there a match between bloody footprints in the house and the blood of one of the victims.  To the extent this statement created confusion, which the prosecution readily acknowledged it might, the prosecution did not allow it to go uncorrected.  It was suitably remedied by the express stipulation read to the jury clarifying the state of the facts regarding blood at the scene.  There is no indication that the prosecutors intended to mislead the jury with false evidence.

{¶ 36} Moreover, the state of the evidence in this case makes it highly improbable that the misleading statement resulted in prejudice, considering that two eye witnesses identified Wade with certainty and placed him at the scene that night. Under the test set forth in *Johnson* and *Lochmondy*, there is no "reasonable likelihood that the false

testimony could have affected the judgment of the jury." Wade's first assignment of error is overruled.

{¶ 37} We next consider Wade's fifth assignment of error, which asserts sufficiency and manifest weight arguments with respect to two of his convictions for aggravated robbery. These include Count 2, aggravated robbery of Michael Ballour, and Count 6, aggravated robbery of T.N.

{¶ 38} The legal concepts of sufficiency of the evidence and weight of the evidence involve different determinations. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). As to sufficiency of the evidence, ' "sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *Id.*, citing Black's Law Dictionary 1433 (6 Ed.1990). A determination as to whether the evidence is legally sufficient to sustain a verdict is a question of law. *Thompkins* at 386. When we review the sufficiency of the evidence upon appeal, we construe the evidence in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. As a result, when we review the sufficiency of the evidence, we do not on appeal reweigh the credibility of the witnesses. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79.

{¶ 39} The relevant inquiry on review of the sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis sic.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A reversal based on insufficient evidence has the same effect as a not-guilty verdict because such a determination "means that no rational factfinder could have voted to convict the defendant." *Tibbs v. Florida*, 457 U.S. 31, 41 (1982).

{¶ 40} As opposed to the concept of sufficiency of the evidence, the court in *Thompkins* noted that "[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.' It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the

greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." *Thompkins* at 387, quoting Black's Law Dictionary 1594 (6 Ed.1990) (emphasis supplied in *Thompkins*). As the finder of fact, the jury is in the best position to weigh the credibility of testimony by assessing the demeanor of the witness and the manner in which he testifies, his connection or relationship with the parties, and his interest, if any, in the outcome. The jury can accept all, a part or none of the testimony offered by a witness, whether it is expert opinion or eyewitness fact, whether it is merely evidential or tends to prove the ultimate fact. *State v. McGowan*, 10th Dist. No. 08AP-55, 2008-Ohio-5894, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 41} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.*, at 387. An appellate court should reverse a conviction as against the manifest weight of the evidence in only the most "exceptional cases in which the evidence weighs heavily against conviction," *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983), instances in which the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.*

{¶ 42} Wade argues on appeal that there is no evidence to establish that he actually committed a theft offense involving any property of Ballour or T.N., and thus he could not be convicted of aggravated robbery with respect to these two. Wade stresses that the jury did return an acquittal on Count 4, alleging aggravated robbery of Angela Harrison, and presumes that this was due to a comparable lack of evidence of theft.

{¶ 43} To the contrary, aggravated robbery in Ohio does not require proof of successful theft or actual items taken: "No person, in *attempting or committing* a theft offense * * * shall do any of the following: * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, branish it, indicate that the offender possesses it, or use it * * * [or] [i]nflict, or attempt to inflict, serious physical harm on another." (Emphasis added); R.C. 2911.01(A); *see also State v. Carter*, 89 Ohio St.3d 593, 601 (2000) ("[A]ggravated robbery can be committed in the course of an 'attempted theft.' ").

{¶ 44} In addition to T.N.'s testimony specifically regarding the disappearance of Tyajah's new cell phone and Sharp's relinquishment of cocaine to the assailants, T.N. also testified that Adams, with Wade armed and present in the kitchen, ordered T.N., Tyajah, Sharp, and Ballour to the floor and ordered them to "[g]ive us everything that you have." (Tr. at 268.)  When Ballour stated that he had "stuff" upstairs, Adams instructed Wade to go upstairs and find it.  (Tr. at 268.)  T.N.'s testimony thus establishes at the very least an attempted theft offense with respect to Ballour and T.N., and sufficiently supports Wade's conviction of aggravated robbery with respect to Ballour and T.N.  These verdicts are not against the manifest weight of the evidence nor supported by insufficient evidence.  Wade's fifth assignment of error is overruled.

{¶ 45} Wade's second assignment of error addresses the sufficiency and manifest weight of the evidence with respect to the criminal gang specifications attached to the 27 violent offenses for which he was convicted.  Ohio's gang specification statute authorizes a trial court to impose an additional mandatory prison term of one, two, or three years upon a defendant who commits a felony offense of violence "while participating in a criminal gang."  R.C. 2941.142; 2929.14(G).  This court has rejected arguments asserting that the gang specification statute is void for vagueness.  *State v. Williams*, 148 Ohio App.3d 473, 2002-Ohio-3777 (10th Dist.).

{¶ 46} Wade does not dispute that the state established through testimony that he is a member of a criminal gang as defined in R.C. 2923.41(A):

> (A) "Criminal gang" means an ongoing formal or informal organization, association, or group of three or more persons to which all of the following apply:
>
> (1) It has as one of its primary activities the commission of one or more of the offenses listed in division (B) of this section.
>
> (2) It has a common name or one or more common, identifying signs, symbols, or colors.
> (3) The persons in the organization, association, or group individually or collectively engage in or have engaged in a pattern of criminal gang activity.

{¶ 47} Instead, Wade argues that the state failed to prove that he committed the crimes for which he was convicted "while participating in" the gang.  Wade argues that proof

of that element would require evidence of a distinct nexus between the offenses and the defendant's gang membership.

{¶ 48} The state responds that there was sufficient evidence to establish that gang membership was sufficiently linked to the crime, based on circumstantial evidence regarding past activities of Wade and his gang, the nature of the crime, and the conduct of Wade and Adams in the course of the crime.

{¶ 49} The state presented the testimony of Detective Robert Vass, of the Columbus Division of Police, regarding Wade's membership and participation in the activities of the Windsor Terrace Banger Squad under the street name "Wizzle."  Detective Vass recounted various incidents of gang-related crime in which Wade was involved, and the state submitted pictures taken from social media websites depicting Wade with other known members of the gang, displaying gang signs, and holding firearms.  Detective Vass testified that gang members often commit crimes individually, outside the context of overt gang membership, in order to boost their own reputation within the gang and the reputation of the gang itself.  (Tr. at 491-92.)  The documentation regarding Wade's gang membership included non-criminal incidents in which Wade frequented known gang hangouts or congregated with other gang members.

{¶ 50} Evidence of this nature has been held sufficient, when considered in conjunction with the nature of the crime, to establish gang specifications.  *See, e.g., State v. Harris*, 10th Dist. No. 15AP-683, 2016-Ohio-3424, ¶ 27; *State v. Dantzler*, 10th Dist. No. 14AP-907, 2015-Ohio-3641, ¶ 30; *State v. Peterson*, 10th Dist. No. 07AP-303, 2008-Ohio-2838, ¶ 80-81.  The state was not required to present evidence indicating that Wade overtly declared that he was committing the crime while participating as a gang member, and the jury could draw the necessary inference based upon testimony, circumstantial evidence, and the nature of the crime.  There was legally sufficient evidence to sustain the specifications, and the verdicts were not against the manifest weight of the evidence. Wade's second assignment of error is overruled.

{¶ 51} Wade's third assignment of error asserts that the trial court erred by allowing Detective Vass, as part of the attempt by the state to establish Wade's participation in a gang, to testify to Wade's prior criminal activity.  Wade contends that this allowed admission of improper other-acts evidence.

{¶ 52} The state submits that we must consider this assignment of error under a plain error standard, because Wade's counsel did not timely object at trial. After examining the record, we find that Wade's objection was sufficiently contemporaneous with the objectionable material, and we need not apply the plain error standard here. *See generally State v. Murphy*, 91 Ohio St.3d 516, 532 (2001).

{¶ 53} Trial court decisions regarding the admissibility of other-acts evidence under Evid.R. 404(B), like other evidentiary determinations, lie within the sound discretion of the trial court. On appeal, we address alleged error in this respect under an abuse-of-discretion standard of review. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407. Evid.R. 404(B) prohibits introduction of evidence regarding crimes, wrongs, or acts, different from those for which the defendant is on trial, in order to prove the character of a defendant, and in order to show action in conformity therewith. *State v. Curry*, 43 Ohio St.2d 66 (1975); *State v. Demarco*, 31 Ohio St.3d 191 (1987). Such evidence is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake. *Id.* The interaction between Evid.R. 404(B), and proof of gang specifications under R.C. 2923.41(A), presents a delicate balance for the trial court, because proof of gang membership and participation will necessarily involve testimony regarding the defendant's past criminal activity. However, because proof of such participation and membership is an element of the gang specification, relevant evidence regarding such conduct, i.e., other acts, is not other-acts evidence because it goes to proof of an element of a charged crime. *Peterson* at ¶ 59. Bearing in mind the inherent difficulty in reconciling these legal requirements, we find that the trial court in the present case did not err in allowing Detective Vass's testimony regarding Wade's past conduct, some of it criminal in nature, in order to prove that Wade was a member of the Windsor Terrace Banger Squad. Wade's criminal history and past conduct were relevant to prove the gang specification. Wade's third assignment of error is overruled.

{¶ 54} Wade's fourth assignment of error asserts that he was denied the effective assistance of trial counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution. In order to establish a claim of ineffective assistance of counsel, a defendant must first demonstrate that his trial counsel's performance was so deficient that it was unreasonable under prevailing professional

norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). The defendant must then establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

{¶ 55} "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances the challenged action 'might be considered sound trial strategy.' " *Id.* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). A verdict adverse to a criminal defendant is not of itself indicative that he received ineffective assistance of trial counsel. *State v. Hester*, 45 Ohio St.2d 71, 75 (1976).

{¶ 56} The first instance of ineffective assistance, Wade asserts, occurred when defense counsel did not object to the prosecution's gang-participation evidence. Because we have found no error in the presentation of this evidence, and in fact trial counsel did object to the evidence, this aspect of counsel's conduct does not support a finding of ineffective assistance.

{¶ 57} The second aspect of trial counsel's performance attacked on appeal is that counsel should have impeached Detective Connor's erroneous testimony regarding Ballour's blood matching blood on Wade's shoe. The record does establish that counsel did impeach this testimony through use of an appropriate stipulation readily entered into by the state.

{¶ 58} Wade's final ineffective assistance claim is that trial counsel should have objected to Detective Connor's testimony that patrol officers had identified Wade as "Wizzle," through the use of confidential informants and patrol officer knowledge. Wade asserts that this was hearsay evidence to establish identity. The state responds that this evidence was not introduced to establish the truth of the matter asserted, but to explain why Wade's picture was included in an ultimate photo array. *See State v. McGrapth*, 10th Dist. No. 11AP-117, 2011-Ohio-6130, ¶ 7-9. We need not in this case test the limits of

backdooring such information, however, because the information could in no way have been prejudicial. During Detective Connor's testimony, he confirmed that Wade bore tattoos on his forearms reflecting the "Wizzle" nickname, and the court even granted, over objection, the state's request to have the defendant display these tattoos for the jury. (Tr. at 359-61.) Wade's fourth assignment of error is overruled.

{¶ 59} Wade's sixth, seventh, eighth, ninth, and tenth assignments of error all allege error in the substance or form of the sentencing entry in this case. Wade, however, withdrew the sixth assignment of error at oral argument of the matter before this court. It will not be further addressed.

{¶ 60} The state's brief on appeal concedes error with respect to assignment of error seven, which argues that the trial court failed to explicitly consider Wade's youth and attendant circumstances as a mitigating factor at sentencing. "A court, in exercising its [sentencing] discretion under R.C. 2929.03(A), must separately consider the youth of a juvenile offender as a mitigating factor before imposing a sentence of life without parole." *State v. Long*, 138 Ohio St.3d 478, 2014-Ohio-849, paragraph one of the syllabus. The state concedes that the sentence imposed in the present case is the "functional equivalent" of a life-without-parole sentence because it consists of consecutive prison terms exceeding a juvenile's life expectancy. *State v. Moore*, 149 Ohio St.3d 557, 2016-Ohio-8288, ¶ 60-62 (addressing non-homicide offenses, but discussing the functional-equivalent principle of life sentencing).

{¶ 61} In addition to the concession of sentencing error expressed in the state's brief with respect to the seventh assignment of error, the state at oral argument conceded error with respect to Wade's eighth assignment of error, which also addresses the trial court's failure to consider Wade's youth as a mitigating factor when imposing sentence. This assignment is likewise sustained.

{¶ 62} Because the state concedes that the trial court did not comply with R.C. 2929.03(A) and (B), as explained in *Long*, we must sustain Wade's seventh and eighth assignments of error, vacate his sentence and remand the matter for re-sentencing. Wades ninth and tenth assignments of error, which address various alleged clerical errors in the sentencing entry, are thereby rendered moot.

{¶ 63} In summary, Wade's first, second, third, fourth, and fifth assignments of error are overruled. Wade has withdrawn his sixth assignment of error. The state concedes error in the seventh and eighth assignments of error, which are sustained, and the ninth and tenth assignments of error are moot. Based upon the foregoing, we affirm Wade's convictions for all the crimes for which he was convicted, but vacate his sentence and remand the matter to the trial court for further proceedings.

*Judgment affirmed in part; reversed in part;*
*case remanded.*

SADLER and BRUNNER, JJ., concur.