[Cite as *State v. Gardner*, 2024-Ohio-1158.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                             No. 111506

    v.                                          :

TIFFANY GARDNER,                    :

    Defendant-Appellant.       :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** APPLICATION DENIED
**RELEASED AND JOURNALIZED:** March 22, 2024

---

Cuyahoga County Court of Common Pleas
Case No. CR-21-658922-A
Application for Reopening
Motion No. 565338

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Rachel E. Cohen, Assistant Prosecuting Attorney, *for appellee.*

Tiffany Gardner, *pro se.*

MICHAEL JOHN RYAN, J.:

{¶ 1} On April 28, 2023, the applicant, Tiffany Gardner, pursuant to App.R. 26(B) and *State v. Murnahan,* 63 Ohio St.3d 60, 584 N.E.2d 1204 (1992), applied to reopen this court's judgment in *State v. Gardner,* 8th Dist. Cuyahoga

No. 111506, 2023-Ohio-307, in which this court affirmed her convictions for murder and felonious assault. On June 6, 2023, the court struck her 62-page application because it exceeded App.R. 26(B)'s ten-page limit and allowed her to file an amended application that complied with the rules.

{¶ 2} On June 20, 2023, Gardner filed an amended application and argued that her appellate counsel should have argued the following: (1) trial counsel was ineffective for not objecting to a witness's lies about her striking the victim with her hand and later pointing the victim out to two other men, (2) trial counsel failed to subpoena the 911 call, (3) trial counsel did not argue that she never called anyone for help as shown by her phone records, (4) trial counsel refused to allow her to testify, (5) the police failed to investigate the case properly, including allowing false statements in their witness reports to engage in a cover-up, (6) she was improperly convicted on a theory of complicity because the other perpetrators were not identified, (7) the police conducted a search of her house without a search warrant, (8) trial counsel failed to cross-examine the employee witness properly, (9) the trial court erred in admitting inflammatory and irrelevant evidence, (10) the prosecutor failed to correct false testimony, and (11) the prosecutor failed to disclose exculpatory evidence and made misleading statements to the jury. The state filed its brief in opposition on July 20, 2023. For the following reasons, this court denies the application.

**Factual and Procedural History**

{¶ 3} On April 14, 2021, Tiffany Gardner was shopping at the Family Dollar Store in East Cleveland. The store's surveillance cameras recorded some of the ensuing incident.

{¶ 4} Gardner had a pouch with, by her count, $10,000 cash in it. She placed the pouch in the child seat section of a shopping cart. After making purchases, which required two shopping carts, she exited the store to put the items in her car, but left the pouch of cash in the cart, which she returned to the walkway in front of the store.

{¶ 5} Shortly after Gardner returned the cart, Leonard Craddock, a 70-year-old man, approached the store, retrieved the cart with the pouch in it, and entered the vestibule of the store. He then saw the pouch of cash and put it in his waistband. Craddock used a card and cash from his own wallet to pay for the items.

{¶ 6} Gardner realized that she had left her pouch and returned to the Family Dollar Store and spoke with the manager, telling her that she had $10,000 in there. The manager reviewed the security video and saw that Craddock had taken the pouch and relayed this to Gardner. Gardner was able stop Craddock as he left the store and took the pouch from his waistband.

{¶ 7} Craddock then walked across the street to an AutoZone store. Gardner was screaming and hollering as she got in her car and followed Craddock. She took a video of herself following Craddock into the store. She repeatedly

demanded, "Why did you try to rob me? Why did you try to rob me?" She shouted invectives and profanities, as she followed him. Craddock tried to apologize.

{¶ 8} Witnesses inside the store, an employee and a customer, testified that Gardner was angry, chasing Craddock, and hitting him on the head. The employee stated she hit him with her whole hand. The customer testified she hit him with her little wallet that she was holding. The customer added that Gardner said, "[I]f I was a man I would do some real damage." The employee testified that he told them to leave. Gardner left the store, but Craddock stayed saying he needed to catch his breath. The customer and the employee testified that when Craddock saw Gardner he would begin to hyperventilate.

{¶ 9} AutoZone's security camera on the side of the store showed a car drive into the store's parking lot and two men exit the car.[1] Gardner walked by the two men and then turned around and started talking to them. After the conversation, Gardner and the two men went into the AutoZone. The customer testified that the men referred to Gardner as "auntie." After looking around, all three left the store.

{¶ 10} The men subsequently went back into the store and went straight to Craddock. They demanded that he come outside with them. Craddock refused. The two men "grabbed" and "dragged" Craddock out of the store.

{¶ 11} The customer and the employee testified that once the two men had Craddock outside, they brutally attacked him by kicking, punching, and stomping

---

[1] On April 14, 2021, only the side camera was working properly.

on him.  The customer testified that after Craddock fell down, the two men picked up a wallet, keys, and a jacket.  After the attack, Craddock attempted to stand but collapsed to the ground; emergency personnel pronounced him dead at the scene.  When the men finished the attack, they went to their car and left.  The video surveillance showed that Gardner remained at the scene for 12 minutes, the time it took the two men to confront and attack Craddock.  Gardner left the scene at the same time the two men left.

{¶ 12}  Craddock's autopsy revealed that he had seven rib fractures, some of which were displaced fractures that punctured the lung causing his death. The medical examiner determined that Craddock's cause of death was blunt-force injury and the manner of death was homicide.

{¶ 13}  After Gardner was arrested, the police obtained a search warrant for her phone.  Extracting data from the phone revealed the video of her following Craddock to the AutoZone store and cursing him.  However, the contents of the phone shed no light on who the two men were.  It appears that the police did not attempt to test DNA from Craddock or from AutoZone.  What DNA tests were done did nothing to further the investigation or help identify the two men.  There were also some irregularities in the investigation.  The police detained the customer witness until the detectives could interview him.  The detectives who arrived on the scene rummaged through Craddock's clothes without putting on gloves.

{¶ 14}  While in jail, Gardner made several phone calls to help her make bail.  During these calls, she stated that an individual she referred to as "Apple Head"

better help pay her bond or she was going to "sing like a bird." She learned that "Apple Head" was complaining about paying $5,000 or $10,000 for her bond, to which she responded, "once it hits, it's a million dollars for both of them." Gardner also stated that she was not going "to do life" for anybody, and if "push come[s] to shove," she would "make sure they pop up." She stated further that Craddock "caused his s***, he took s*** from me." The court admitted these recordings into evidence.

{¶ 15} The grand jury indicted Gardner on two counts of aggravated murder, three counts of murder, and one count each of aggravated robbery and felonious assault. Prior to trial, the state dismissed the aggravated murder counts and one of the murder counts, all of which included "purposely" as an element of the crimes.

{¶ 16} During the trial, the defense established that the two men have not been identified and that the investigation is still open. The state and the defense agreed on an extended jury instruction on complicity.

{¶ 17} At the close of the state's case, the following discussion occurred:

THE COURT: I'm going to turn to you, Ms. Gardner. You know that you could testify in this matter. I know you've spoken to your counsel about that issue, if you were to choose — you know, of course, you don't have to testify; it's entirely up to you. I know you've spoken to Ms. Tipping and Mr. Williams about that issue, but for the record, it's your choice not to testify; is that correct?

THE DEFENDANT: I mean, I don't really know what to say.

[DEFENSE COUNSEL]: May we have a moment, your Honor?

THE COURT: You may.

THE DEFENDANT: I will not be testifying.

THE COURT: So I've given you just a few minutes to speak with your counsel again. It's been my understanding through the entire past few days you have not intended to testify; is that correct?

THE DEFENDANT: Yes.

THE COURT: Are you sure?

THE DEFENDANT: (Nodding in the affirmative.)

THE COURT: Is that a "yes"?

THE DEFENDANT: Yes.

(Tr. 570-571.)

{¶ 18} The defense did not put forth further evidence, other than the DNA reports.

{¶ 19} During closing argument, defense counsel concentrated on the state's need to prove complicity with evidence beyond a reasonable doubt by arguing the following: Mere presence is not enough. The state obtained a search warrant for Gardner's cell phone, but nothing in the phone indicated that she knew the two men or called them. There was no audio evidence of what she said to the men. Thus, no direct evidence of solicitation. There was no incriminating DNA evidence. The state carefully selected just snippets of the jail calls. The investigation was incomplete and still open. Evidence of complicity, the defense argued, was so lacking that only impermissible speculation could link Gardner to the murder.

{¶ 20} The jury found Gardner guilty of one count of murder and felonious assault. The trial court merged those two offenses and imposed the required sentence of life in prison with parole eligibility after 15 years.

{¶ 21} Appellate counsel recognized the essential importance of complicity and argued that there was insufficient evidence to prove complicity and that the verdict was against the manifest weight of the evidence. He also argued that the trial court erred in admitting the jail calls into evidence and that trial counsel was ineffective for not objecting to their admission.

**Analysis of Law**

{¶ 22} In order to establish a claim of ineffective assistance of appellate counsel, the applicant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989); and *State v. Reed*, 74 Ohio St.3d 534, 660 N.E.2d 456 (1996).

{¶ 23} In *Strickland,* the United States Supreme Court ruled that judicial scrutiny of an attorney's work must be highly deferential. The court noted that it is all too tempting for a defendant to second-guess his lawyer after conviction and that it would be all too easy for a court, examining an unsuccessful defense in hindsight, to conclude that a particular act or omission was deficient. Therefore, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland* at 689.

{¶ 24} Specifically, in regard to claims of ineffective assistance of appellate counsel, the United States Supreme Court has upheld the appellate advocate's prerogative to decide strategy and tactics by selecting what he thinks are the most promising arguments out of all possible contentions. The court noted: "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*, 463 U.S. 745, 751-752, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Indeed, including weaker arguments might lessen the impact of the stronger ones. Accordingly, the court ruled that judges should not second-guess reasonable professional judgments and impose on appellate counsel the duty to raise every "colorable" issue. Such rules would disserve the goal of vigorous and effective advocacy. The Supreme Court of Ohio reaffirmed these principles in *State v. Allen*, 77 Ohio St.3d 172, 1996-Ohio-366, 672 N.E.2d 638.

{¶ 25} Moreover, even if a petitioner establishes that an error by his lawyer was professionally unreasonable under all the circumstances of the case, the petitioner must further establish prejudice: but for the unreasonable error there is a reasonable probability that the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland* at 694. A court need not determine whether counsel's performance was deficient before examining prejudice suffered by the defendant as a result of alleged deficiencies. *Bradley* at 143.

{¶ 26} Appellate review is strictly limited to the record. *The Warder, Bushnell & Glessner Co. v. Jacobs*, 58 Ohio St. 77, 50 N.E. 97 (1898). Thus, "a reviewing court cannot add matter to the record that was not part of the trial court's proceedings and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus. "Nor can the effectiveness of appellate counsel be judged by adding new matter to the record and then arguing that counsel should have raised these new issues revealed by the newly added material." *State v. Moore*, 93 Ohio St.3d 649, 650, 758 N.E.2d 1130 (2001). "Clearly, declining to raise claims without record support cannot constitute ineffective assistance of appellate counsel." *State v. Burke,* 97 Ohio St.3d 55, 2002-Ohio-5310, 776 N.E.2d 79, ¶ 10.

{¶ 27} Gardner first argues that trial counsel was ineffective for failing to object when the employee perjured himself by testifying that she hit Craddock in the head with her hand and then later pointed Craddock out to the two men. She also submits that all the witnesses lied on the stand as would be shown by the discovery packet and that the prosecutor engaged in misconduct by not correcting the false testimony or revealing exculpatory evidence. However, Gardner fails to indicate where in the record there is any contradicting evidence that would show perjury. The discovery packet and the witness statements were not admitted into evidence. Appellate counsel is limited to the record.

{¶ 28} Moreover, in *State v. Powell,* 8th Dist. Cuyahoga No. 107276, 2020-Ohio-3887, the App.R. 26(B) applicant argued that the inconsistencies between the

victims' statements and their trial testimony established that the state used perjured evidence to obtain his conviction; thus, his appellate counsel was ineffective for not arguing this issue. This court rejected the argument noting "mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 83, quoting *United States v. Lockmondy,* 890 F.2d 817, 822 (6th Cir.1989). Similarly, the Seventh District held: "Confusing or inconsistent statements within a state witness's testimony do not equate with the state suborning perjury." *State v. Boyd,* 7th Dist. Mahoning No. 23 MA 0012, 2023-Ohio-47250. Furthermore, the trial court reviewed the employee's witness statement and concluded that there was nothing materially inconsistent. (Tr. 363-365.) Therefore, appellate counsel properly rejected the argument that the state used perjured evidence or withheld evidence to obtain the convictions.

{¶ 29} Gardner further proposes that her appellate counsel should have argued that neither the prosecution nor defense counsel subpoenaed or played the 911 call, which she claims is exculpatory evidence. The argument is self-defeating. Without the call being in the record, appellate counsel had no foundation to argue it. Similarly, Gardner's allegations that the police failed to investigate the case properly by allowing false statements in their witness reports to engage in a cover-up fails for lack of record support. The witness statements were not part of the record.

{¶ 30} Next, Gardner claims that appellate and trial counsel failed to raise and argue that her cell phone call-log did not reveal that she called anyone to come help her. This is inaccurate. On cross-examination, Detective Marche admitted that other than the video, "there was no additional information of value that was scoured from her telephone." (Tr. 543.) During closing, defense counsel argued that if there was anything on Gardner's phone that supported the idea that she called somebody for help, the prosecutor would have heralded it. But there is no evidence that she called anyone. (Tr. 588-589.) In the appellate brief, counsel argued "[t]hat there was no DNA evidence, no phone calls or texts messages indicating she called these males to the scene, there was no consideration given for these males to commit a crime for her, and no proof that she even knew these males." (Appellant's brief, pg. 12.)

{¶ 31} Gardner insists that her trial counsel refused to allow her to testify and that appellate counsel should have argued that trial counsel was ineffective for doing so. However, the record does not provide a basis for making that argument. At the end of the state's case, the trial judge asked Gardner if she was going to testify. She replied that she did not know what to say. The judge allowed her to discuss that matter with her attorneys; after which she confirmed twice that she would not testify. Moreover, deciding whether a defendant should testify is one of the most important strategic decisions in the course of a trial. *State v. Smith,* 11th Dist. Portage No. 2022-P-0034, 2023-Ohio-1533; *State v. Mabry,* 9th Dist. Medina No.

2514-M, 1996 Ohio App. LEXIS 4420 (Oct. 9, 1996). Following the admonition of the Supreme Court, this court will not second guess this strategic decision.

{¶ 32} Gardner next argues that she could not be tried or convicted as complicit without the principals being identified or charged. However, the complicity statute refutes her argument. R.C. 2923.03(B) provides: "It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender." Further subsection (F) provides: "Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense." The courts of Ohio have long held the principle that a conviction of the principal is not a prerequisite to trial as an aider or abettor. *Hartshorn v. State,* 29 Ohio St. 635 (1876); *State v. Graven,* 52 Ohio St.2d 112, 369 N.E.2d 1205 (1977). *State v. Gowdy,* 6th Dist. Erie No. E-06-071, 2009-Ohio-385, ¶ 21 — "the state was not required to either identify or charge an individual as the principal offender in order to obtain the conviction of appellant as a complicitor." Thus, her argument does not raise a colorable claim of ineffective assistance of appellate counsel.

{¶ 33} Gardner further argues that the police conducted a search of her home without a warrant. The police arrested her pursuant to an arrest warrant. (Tr. 527.) The police also obtained a search warrant for her phone. (Tr. 529.) There was no testimony concerning a search of her house, and no evidence from her home

was put into evidence. Accordingly, appellate counsel had no foundation to argue this.

{¶ 34} Gardner also alleges that her trial counsel was ineffective for failing to cross-examine the employee effectively. However, as the Supreme Court of Ohio ruled in *State v. Leonard,* 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 146, "[t]he extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel."

{¶ 35} Gardner contends that the prosecutor made false, misleading, and inflammatory remarks, such as "[i]t could have ended right in front of the Family Dollar when she got her bag back. She could have got into her car and sped off." The Supreme Court of Ohio in *State v. Mauer,* 15 Ohio St.3d 239, 266, 473 N.E.2d 768 (1985), held that "the conduct of a prosecuting attorney during trial cannot be made a ground for error unless that conduct deprives the defendant of a fair trial." The court has reviewed the transcript, the evidence, and the closing arguments and concludes that the defendant received a fair trial.

{¶ 36} In summary, the gravamen of this case was whether the evidence proved beyond a reasonable doubt that Gardner solicited, procured, aided, abetted or conspired with the two men to beat and thus kill Craddock. Both trial counsel and appellate counsel knew this and based the strategy of the case to defeat that proposition. They endeavored to marshall the facts to create a reasonable doubt but were unsuccessful. Gardner's micro-analysis of the evidence does not cast a doubt

about the effectiveness of counsel.  As this court concluded in its original opinion, "even if [the jail calls] had been excluded, the other evidence presented overwhelmingly supports the conviction."  *State v. Garnder*, 8th Dist. Cuyahoga No. 111506, 2023-Ohio-307, ¶ 50.

{¶ 37} Accordingly, this court denies the application to reopen.

_____

MICHAEL JOHN RYAN, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
SEAN C. GALLAGHER, J., CONCUR